UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

Travers A. Greene,

Petitioner

v.

Jeremy Bean, et al.,

Respondents

Case No. 2:07-cv-00304-CDS-DJA

**Amended Order Granting, in Part, 28 U.S.C. § 2254 Second-Amended Petition and Denying Motions for Discovery and an Evidentiary Hearing**

[ECF Nos. 119, 200, 202]

Petitioner Travers A. Greene is a Nevada state prisoner who has been sentenced to death following his convictions for conspiracy to commit murder, two counts of first-degree murder with the use of a deadly weapon, and possession of a stolen vehicle. ECF No. 41-8. Greene has filed a counseled second-amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 119. This matter is before this court for adjudication on the merits of the remaining grounds[1] in the petition.[2] For the reasons discussed below, I (1) grant the petition as to grounds 1(a), 1(b), and 1(d), vacating Greene's death sentence due to his counsel's ineffectiveness during the penalty phase of the trial, but (2) deny the petition as to the remaining grounds, determining that Greene is not entitled to a new trial.

## I. Background

### A. Factual background

Greene's convictions and sentences are for the murders of Deborah Farris and Christopher Payton in Clark County, Nevada, on September 23, 1994. In its opinion on Greene's direct appeal, the Supreme Court of Nevada described the factual background of the case as follows:

---

[1] This court previously dismissed the following grounds: 2(a), 2(b), 4, portions of 6(a), 11(a), 11(b), portions of 12(a), 12(b), and 14. ECF No. 179.

[2] I previously denied the petition, but I granted Greene's motion to amend to allow for the consideration of the evidence presented during Greene's second state post-conviction proceedings. ECF Nos. 220, 234.

In the early morning hours of September 23, 1994, appellants Travers Arthur Greene and Leonard Arthur Winfrey drove to Sunrise Mountain in a stolen blue Camaro, armed with stolen weapons, an M-14 assault rifle and a handgun. They intended to experiment with the rifle to see how big a hole it would make when fired at something. Upon reaching the top of Sunrise Mountain, they spotted a powder blue Volkswagen with Deborah Farris and Christopher Payton sleeping beside it. Winfrey drove the Camaro up to the Volkswagen and stopped, shining the headlights on Farris and Payton. Armed with the assault rifle, Greene immediately exited the Camaro and shot Payton in the head. Greene then attempted to shoot Farris, but the assault rifle jammed. While Greene tried to unjam the rifle, Farris began pleading for her life, crying "please don't do this." Meanwhile, Winfrey, who was monitoring the situation from the car, exited the vehicle, pointed the handgun at Farris and pulled the trigger. However, the handgun also malfunctioned, and no bullet discharged. At this point, Farris continued to plead with Greene and Winfrey not to kill her. Shortly thereafter, Greene succeeded in fixing the assault rifle, pointed it at her head and shot her in the neck, saying "shut up, bitch."

Heather Barker witnessed these killings while seated in the Camaro. Barker had been at Winfrey's apartment earlier that evening, and Greene and Winfrey had promised to give her a ride home. After the first shot was fired, Barker said to Winfrey, "oh, my God, did he shoot somebody, I want to go home." Barker also heard a female voice saying, "please don't do this, you could take anything, you could take my car, just please don't do this." Barker was a friend of Winfrey's but had not met Greene until that evening.

After the killings, [Greene] and Winfrey got back into the Camaro. As they were driving away, Greene laughed about how it looked when the eyeballs popped out of Payton's head. He also derisively talked about how the blood bubbled out of Farris's neck when he shot her.

After leaving Sunrise Mountain, Winfrey drove to Barker's house and Greene cleaned the assault rifle in her bathroom. The three then went to Winfrey's apartment where they had met earlier that evening. Greene left in the car, Winfrey went up to his bedroom to sleep, and Barker walked home.

The next day, Phil Souza, Winfrey's roommate, noticed that Winfrey acted as if something was bothering him. When the eleven o'clock news showed a story about two people being killed on Sunrise Mountain, Winfrey became upset and began banging his head on the ground. Approximately 45 minutes later, Greene arrived, and Souza overheard Greene say, "they found the bodies," and "we are not through yet." Winfrey made no statement regarding what had happened. The following day Souza approached a policeman on the street and told him what he had observed.

> This information led to the investigation of both Greene and Winfrey and their subsequent arrest for the murders of Farris and Payton. On September 25, 1994, Greene and Winfrey were each charged by way of Information with: one count of conspiracy to commit murder; two counts of murder with use of a deadly weapon; and one count of possession of a stolen vehicle.
>
> The State filed notices to seek the death penalty against both defendants, alleging the following circumstances: (1) the murder was committed to avoid or prevent a lawful arrest or to effect an escape from custody, NRS 200.033(5); (2) the murder was committed upon one or more persons at random and without apparent motive, NRS 200.033(9); (3) the defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first or second degree, NRS 200.033(12).
>
> > [Footnote: Effective October 1, 1995, the "more than one offense" aggravating circumstance was renumbered from NRS 200.033(10) to NRS 200.033(12). All further references to this statutory section will be to NRS 200.033(12).]
>
> The first jury trial was conducted jointly with Greene and Winfrey as co-defendants. However, due to incurable *Bruton* issues, the district court granted a mistrial to Greene. Thereafter, the first jury trial continued against Winfrey alone, and a second separate jury trial commenced against Greene. Both Greene and Winfrey were convicted of all charges.
>
> Greene and Winfrey each had separate penalty hearings. Against Greene, the jury found the following aggravators for both killings: (1) the murder was committed upon one or more persons at random and without apparent motive, NRS 200.033(9); and (2) the defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first degree, NRS 200.033(12). Against Greene, the special verdicts reflect that the jury also found the following mitigating circumstances: (1) youth of the defendant at the time of the crime; and (2) any other mitigating circumstances to exist in this case. The jury determined that the aggravators outweighed the mitigators and consequently returned a death verdict against Greene.

ECF No. 43-3 at 9–34.

### B. Procedural background

Greene appealed his judgment of conviction, and on January 4, 1997, the Supreme Court of Nevada affirmed. ECF No. 43-3 at 9. The Supreme Court of Nevada denied rehearing on May 20, 1998. ECF No. 43-2 at 11. Remittitur issued on May 28, 1998. ECF No. 43-4 at 2.

Greene filed a pro se petition for writ of habeas corpus in the state court on May 26, 1998. ECF No. 43-3. Counsel was appointed, and, with counsel, Greene amended his petition on March 2, 2000. ECF No. 43-12 at 24–28. Greene filed a supplement to his amended petition on July 6, 2001. ECF Nos. 44-2, 44-3, 44-4, 44-5, 44-6, 44-7, 44-8. After an evidentiary hearing, the state court denied Greene's petition on February 8, 2005. ECF Nos. 45-5, 45-6, 45- 8 at 5–29. Greene appealed, and the Supreme Court of Nevada affirmed on November 14, 2006. ECF No. 50-7 at 2–24. The Supreme Court of Nevada denied en banc reconsideration on March 1, 2007. ECF No. 50-9 at 17–18. Remittitur issued on March 1, 2007. ECF No. 50-9 at 20.

Greene initiated this federal habeas corpus action by filing a pro se petition for writ of habeas corpus on March 9, 2007. ECF No. 1. After counsel was appointed, Greene filed a first amended habeas petition on February 6, 2008. ECF No. 16. Respondents filed a motion to dismiss on July 1, 2008. ECF No. 28. Greene then filed a motion for leave to conduct discovery on July 31, 2008, and a motion for stay on August 4, 2008. ECF Nos. 52, 65. On February 6, 2009, the Court granted the motion for stay and denied the motions to dismiss and for leave to conduct discovery. ECF No. 77.

Greene filed a second state habeas petition on February 28, 2008. ECF No. 130-3. The state court conducted an evidentiary hearing, and then denied the petition, on state-law procedural grounds, on March 29, 2010. ECF Nos. 120-17, 120-18, 157-14. Greene appealed, and the Supreme Court of Nevada affirmed on June 24, 2016. ECF No. 111-4. The Supreme Court of Nevada denied rehearing on October 21, 2016. ECF No. 111-6. The United States Supreme Court denied certiorari on June 19, 2017. ECF No. 111-7. Remittitur issued on June 23, 2017. ECF No. 111-8.

On January 10, 2017, during the stay of this action, Greene filed a motion to temporarily lift the stay to supplement his petition with a claim based on *Hurst v. Florida*, 577 U.S. 92 (2016). ECF No. 99. Greene filed his proposed new claim with that motion. ECF No. 100. The court granted the motion on March 22, 2017, and ordered that Greene's *Hurst* claim would be considered and added to his habeas petition. ECF No. 102.

Also on January 10, 2017, Greene filed a third state habeas petition, asserting, in state court, his claim based on *Hurst*. ECF No. 158-19. The state district court granted a motion to dismiss on October 2, 2017. ECF No. 158-26. Greene appealed, and the Supreme Court of Nevada affirmed on September 13, 2019. ECF No. 111-12. Remittitur issued on October 9, 2019. ECF No. 111-13.

The stay of this case was lifted on December 6, 2019. ECF No. 113. On May 6, 2020, Greene filed a second amended habeas petition, which is now his operative petition. ECF No. 119. On March 9, 2021, the respondents filed a motion to dismiss. ECF No. 129. With his opposition to the motion to dismiss, Greene filed a motion for leave to conduct discovery and a motion for evidentiary hearing. ECF Nos. 164, 167. On November 22, 2021, this court granted the motion to dismiss, in part, and denied it, in part. ECF No. 179. This court also denied the motion for leave to conduct discovery and for an evidentiary hearing. *Id*. Respondents answered the remaining claims in Greene's second amended habeas petition on January 27, 2023. ECF No. 190. Greene replied on December 21, 2023. ECF No. 198. And respondents filed their sur-reply on June 10, 2024. ECF No. 215.

Greene then again moved for leave to conduct discovery and for an evidentiary hearing. ECF Nos. 200, 202. Respondents responded, and Greene replied. ECF Nos. 211, 212, 218, 219.

## II. Governing Standard of Review

### A. The Antiterrorism and Effective Death Penalty Act ("AEDPA")

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

**B. Procedural default**

Generally, to overcome a procedural default based upon the actual or projected application of an adequate and independent state law procedural bar, a federal petitioner must show: (a) cause for the procedural default and actual prejudice from the alleged violation of federal law; or (b) that a

fundamental miscarriage of justice will result in the absence of review, based on a sufficient showing of actual factual innocence. *See, e.g.*, *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003). Under *Martinez v. Ryan*, a petitioner can demonstrate cause to potentially overcome the procedural default of a claim of ineffective assistance of trial counsel by demonstrating that either (a) he had no counsel during the state post-conviction proceedings, or (b) such counsel was ineffective. 566 U.S. 1, 14 (2012). To demonstrate "prejudice" under *Martinez*, the petitioner must show that the defaulted claim of ineffective assistance of trial counsel is a "substantial" claim. *Id.* A claim is "substantial" for purposes of *Martinez* if it has "some merit," which refers to a claim that would warrant issuance of a certificate of appealability. *Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019). This standard does not require a showing that the claim will succeed, but instead only that its proper disposition could be debated among reasonable jurists. *See generally Miller-El v. Cockrell*, 537 US. 322, 336–38 (2003).

**C. Ineffective Assistance of Counsel**

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

When an ineffective-assistance-of-counsel claim is based on counsel's performance at the sentencing phase of a capital case, a defendant is prejudiced only if "there is a reasonable probability that, absent [counsel]'s errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a substantial, not just conceivable, likelihood of a different result." *Pinholster*, 563 U.S. at 189 (citation and internal quotation marks omitted). This standard does not require a defendant to show that it is more likely than not that adequate representation would have led to a better result, but "[t]he difference" should matter "only in the rarest case." *Strickland*, 466 U.S. at 697. To determine whether a prisoner satisfies this standard, a court must "consider the totality of the evidence before the judge or jury"—both mitigating and aggravating. *Id.* at 695.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

## III. Discussion

### A. Ground 1—ineffective assistance of trial counsel

In ground 1, Greene alleges that his convictions and death sentence are invalid under federal constitutional guarantees of effective assistance of counsel, due process, equal protection, confrontation, and a reliable sentence due to his trial counsel's failures to investigate, develop, and present an adequate defense at both the guilt and penalty phases of his trial. ECF No. 119 at 15. This

court previously found grounds 1(a), 1(b), 1(c), 1(d), and 1(e) to be procedurally defaulted and deferred ruling on the cause and prejudice analysis under *Martinez* until the time of merits review. ECF No. 179 at 19–24. I discuss grounds 1(a), 1(b), and 1(d) together given their substantial overlap.

**1. Grounds 1(a), 1(b), and 1(d)—failure to investigate Greene's life history, evaluate Greene's mental health, and present mitigation evidence**

In ground 1(a), Greene alleges that his trial counsel failed to investigate and discover evidence of his life history. ECF No. 119 at 17. Although not recounted in full detail here, in support of this ground, Greene alleges that his trial counsel failed to investigate the following facts: he was put up for adoption at birth, he lived in foster care for seven months before being adopted, his adoptive parents got divorced when he was six years old, he was the victim of perpetual sexual abuse at the age of eight, he was brutally gang raped a few years later, he was sexually assaulted in juvenile detention, his adoptive father was too busy working and dealing with his own health issues to help him cope, his adoptive mother was so detached that she failed to stop him from being physically abused by her brother, his adoptive parents both physically abused him, he turned to drugs as a teenager, he landed in the criminogenic California Youth Authority ("CYA") for almost two years,[3] he attempted to turn his life around upon moving to Las Vegas to live with his adoptive father, and he was lured back into a life of drugs and crime by the drug dealer who lived next door.[4] *Id.* at 17–57. In ground 1(b), Greene alleges that his trial counsel was ineffective for failing to evaluate his mental health. *Id.* at 63. And in ground 1(d), Greene alleges that his trial counsel was ineffective for failing to present evidence of his life history and mental health problems as mitigation at the penalty hearing. *Id.* at 94. Specifically, Greene argues that his trial counsel (1) failed to present mental health professionals to discuss his mental health problems, (2) failed to present evidence of his drug problems, (3) failed to present evidence that his CYA experience was responsible for the problems he had in Las Vegas, (4) failed to present more evidence related to his repeated sexual

[3] Notably, Daniel Macallair, the Executive Director of the Center of Juvenile and Criminal Justice, opined that the environment of CYA "would more likely have reinforced criminal propensities and further impaired Mr. Greene's ability to adjust to the outside world." ECF No. 132-1 at 57.

[4] Greene presents declarations from family members, various associates, neighbors, and even his molester to support these facts. *See* ECF No. 136-1 at 163–213.

assaults, (5) failed to investigate and present records to help explain his traumatic life, and (6) failed to interview and present the testimony of witnesses who would have explained that he was a good person whose bad behavior was the result of a troubled background. *Id.* at 94–117.

**a. Background information**

Prior to trial, Greene's trial counsel filed an ex parte application for the appointment of a psychiatrist. ECF No. 21-11 at 48. In his affidavit in support of the application, Greene's trial counsel stated, "in order to adequately and effectively represent Greene it is absolutely necessary to have expert psychiatric assistance." *Id.* at 51–52. The state court granted the application. *Id.* at 53. However, a pre-trial psychiatric evaluation was never completed.

According to Greene's trial counsel, "[t]here was a decision that we did need [the evaluation] done," but, "because of circumstances that occurred at the last minute before trial, it wasn't done" due to "problems with [the psychiatrist]." ECF No. 21-10 at 68, 70. In an affidavit prepared during post-conviction proceedings, Greene's trial counsel explained the following:

> I did not call a mental health professional, and cannot recall at this time the exact reasoning for not doing so. There were a number of things that could have effected the decision and I believe the decision revolved around a fear that any mental health professional would have found Mr. Greene to be a highly dangerous and violent individual. In the abundance of caution I should have had the evaluation completed before making such a decision.

ECF No. 21-11 at 57–58. During Greene's post-conviction evidentiary hearing, Greene's trial counsel reaffirmed the foregoing: "I probably should have, in the abundance of caution, had the evaluation completed before deciding not to call a mental health professional." ECF No. 21-8 at 14–15. When asked if he would "agree that [he] would not have been able to present a reasonably effective defense in light of the fact that [he] did not know from which mental illness Mr. Greene was suffering," Greene's trial counsel testified, "[t]hat might have had an impact." *Id.* at 45.

Greene's initial state post-conviction counsel obtained an evaluation from Louis F. Mortillaro, Ph.D., a licensed psychologist. ECF No. 48-7 at 10. Dr. Mortillaro found, *inter alia*, the following: (1) Greene's psychosocial history "seriously impaired his ability to form personal attachments so critically necessary," meaning "he will be unable to form deep and loving

relationships as well as use people for his own selfish purposes," (2) his drug usage "placed him in a state of altered consciousness that would impair his use of his problem-solving, common sense, and practical judgment," (3) "Greene was not provided with successful past psychological and psychiatric treatment that would have resolved his many psychological problems with their origin early in his developmental history," (4) "[i]t is hypothesized that [Greene's] frontal lobes, which connect directly to the limbic or emotional center of the brain, were not sufficiently developed to inhibit his behavioral quest for having his needs met in an appropriate fashion," and (5) "[t]hwarted in need attainment, [Greene] switched to acting out inappropriate behavior as a way of gaining attention that he so desperately craved as a result of his rather tragic early developmental history." *Id.* at 12–13.

Greene's second state post-conviction counsel obtained a psychological evaluation from Jethro W. Toomer, Ph.D. ECF No. 132-1 at 11–27. Dr. Toomer found, *inter alia*, the following: (1) Greene's "history and the results of [his] evaluation suggest that his behavior is influenced by the existence of severe psychological deficits that are of long standing duration," (2) "[a]s a result of [his] early trauma, inconsistency and nurturance deprivation, the development of normal ego functions of secondary thought processes, including integration, realistic planning, adaptation to the environment, maintenance of object relations and defenses against primitive, unconscious impulses are weakened," (3) "[t]hese deficits combined with a history of toxic substances relate to his behavior in the current offense," and (4) Greene suffers from "major depression, generalized anxiety disorder, psychoactive substance abuse and . . . borderline personality disorder." *Id.* at 19–22.

Greene's second state post-conviction counsel also obtained a neuropharmacological opinion from Jonathan J. Lipman, Ph.D. ECF No. 132-1 at 24–47. Dr. Lipman reported, *inter alia*, that (1) "[a]t the time of the offenses [Travers] Greene was suffering from chronic psychotoxic effects of methamphetamine abuse, protracted sleeplessness and . . . the acute effects of phencyclidine (PCP) intoxication," and (2) Greene has "chronic life-long psychological derangements and maladaptive

cognitive dysfunctions rendering him exquisitely vulnerable to suffering adverse effects in thought, emotion and behaviors under psychotoxic drug influence." *Id.* at 24.

**b. Investigative standard**

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Additionally, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* In assessing counsel's investigation, the Court must conduct an objective review of counsel's performance, measured for "reasonableness under prevailing professional norms." *Id.* at 688. This includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." *Id.* at 689; *see also Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Further, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

**c. Analysis**

Even scrutinizing Greene's trial counsel's performance under a highly deferential lens, there is no doubt that Green's trial counsel's abysmal investigation and mitigation presentation at the penalty hearing was not based on any sort of strategy. Indeed, as alleged within these grounds, Greene's trial counsel's investigation into his life history was far from robust and his investigation into Greene's mental health and drug abuse issues was nonexistent even though the trial court approved a psychiatric evaluation. *See Jones v. Ryan*, 52 F.4th 1104, 1117 (9th Cir. 2022) ("Classic mitigation evidence includes mental disorders, mental impairments, family history, abuse, physical impairments, and substance abuse."); *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) ("The defendant's history of drug and alcohol abuse should also be investigated."). For these reasons and the reasons discussed in the remainder of this analysis, I find that (1) Greene's state post-conviction counsel was ineffective in failing to raise these grounds to the extent they are alleged here, and (2) these grounds are substantial. Thus, Greene has demonstrated cause and prejudice to overcome the procedural defaults of these grounds. *See Ramirez*, 937 F.3d at 1241 (explaining that a claim is

"substantial" for purposes of *Martinez* if it has "some merit," which refers to a claim that would warrant issuance of a certificate of appealability). Therefore, I turn to the merits of these grounds.

Turning first to Greene's trial counsel's performance, I acknowledge that the jury heard the major highlights of Greene's childhood traumas from his trial counsel's presentation of his adoptive father's and mother's testimonies at the penalty hearing[5]: the repeated molestation he suffered from at the age of eight, the molestation he suffered from at the hands of a gang of boys, the effect his adoption had on him, his adoptive parents' divorce, his detention in a juvenile facility, and his abuse of drugs and alcohol at a young age. ECF No. 40-11 at 4, 6, 13–14, 19–20; ECF No. 40-12 at 11, 16, 26, 31; ECF No. 40-13 at 6. However, Greene's traumas could have been more thoroughly investigated and then painted for the jury. In fact, when comparing Greene's adoptive parents' testimonies at the penalty hearing to the multitude of other testimonies that could have been presented, I find that Greene's trial counsel only skimmed the surface of the depth and breadth of Greene's life history. *See, e.g.*, ECF No. 136-1 at 176 and 184 (declarations of Greene's cousins), at 180 (declaration of Greene's molester), at 182 (declaration of Greene's biological mother), at 186 (declaration of Greene's sister), at 190 (declaration of Greene's aunt), and at 194 (declaration of Greene's biological father).

Further, as already stated, Greene's trial counsel failed to put on any expert or present any scientific evidence as to Greene's mental health or drug abuse issues and the effect those issues had on his behavior. Indeed, it should have been customary in a death penalty case like this for trial counsel to have attempted to obtain a psychiatric evaluation like the one prepared by Dr. Mortillaro, a psychological evaluation like the one prepared by Dr. Toomer, and/or a neuropharmacological opinion like the one by Dr. Lipman. *See Lambright v. Schriro*, 490 F.3d 1103, 1116 (9th Cir. 2007) ("To perform effectively . . . counsel must . . . engage in sufficient preparation to be able to present and explain the significance of all the available mitigating evidence." (Internal quotation marks and brackets omitted)).

[5] The only other witness Greene's trial counsel put forth at the penalty hearing was a minister who testified that Greene was "really want[ing] to make a change in his life" after being put in jail. ECF No. 40-12 at 25.

Consequently, I find that Greene's trial counsel's generic mitigation presentation at the penalty hearing, which provided woefully inadequate and uncomprehensive information regarding his life history and resulted in the jury being wholly unaware of his mental health issues and the extent of his drug abuse issues, fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688.

Turning next to prejudice, I find juror declarations obtained during Greene's second state post-conviction proceedings to be particularly powerful. Steve Kyong, Ethel Majors, and Capitola Swanson all served on Greene's jury. *See* ECF No. 136-1 at 196, 198, 200. Kyong declared that "[i]f [he] had known more about Mr. Greene's life history and psychological problems, [he] would have been less likely to vote for the death penalty." *Id.* at 196. Majors declared that "[k]nowing that Mr. Greene had a drug problem would likely have kept [her] from voting for the death penalty." *Id.* at 198. Majors also declared that had she "hear[d] the more disturbing details of Mr. Greene's molestation" and "expert testimony regarding the affect that may have had on Mr. Greene's development," she "likely" would not have voted for the death penalty. *Id.* at 199. Swanson declared that "[i]f [she] would have heard from a psychologist that Mr. Greene had mental problems, [she] probably would not have voted for the death penalty." *Id.* at 200. More importantly, Swanson also declared that "[i]f [she] would have known about Mr. Greene's severe drug problem, [she] would not have voted for the death penalty." *Id.* Given these declarations, there is no guessing whether it is reasonably likely that Greene would have received a different sentence if the new mitigation evidence were to be added to the mix of the mitigation evidence that was presented at trial. Indeed, given these declarations, Greene's new evidence would have made a difference because the jurors said so, especially Swanson who was definite in her statement that she would not have voted for the death penalty had she known about Greene's drug problem. *Cf. Washington v. Shinn*, 46 F.4th 915, 931 (9th Cir. 2022) ("We know that Washington's new evidence would not have made a difference because the sentencing judge said so."); *Cook v. Ryan*, 688 F.3d 598, 612 (9th Cir. 2012) (finding no prejudice where "the same trial judge who sentenced" the petitioner stated that the new evidence

"would not have made any difference"); *Eddings v. Oklahoma*, 455 U.S. 104, 114–15 (1982) (emphasizing that "[t]he sentencer . . . may determine the weight to be given relevant mitigating evidence").

And even looking at the issue objectively, meaning without taking into account the idiosyncrasies of these three jurors, I still find that it is reasonably likely that Greene would have received a different sentence if the new mitigation evidence were to be added to the mix of mitigation evidence that was presented at trial. Dr. Mortillaro found that Greene lacked the full ability to form personal attachments, to use practical judgment, and to control his impulsivity. Dr. Toomer found that Greene suffers from psychoactive substance abuse and borderline personality disorder, Greene has a history of abusing toxic substances, and Greene's psychological deficits and drug usage influenced his behavior in this crime. And Dr. Lipman found that Greene's psychological derangements made him susceptible to adverse behaviors when under the influence of drugs. This information would have provided a more detailed, concrete picture of Greene and would have provided clarity regarding the connection between Greene's history, psychological issues, and drug abuse with his behavior in this case. This contextualization is significant. As the Court of Appeals for the Ninth Circuit has stated, it is rare that habeas relief is granted "based solely upon humanizing, rather than explanatory, mitigating evidence in the face of extensive aggravating circumstances." *Allen v. Woodford*, 395 F.3d 979, 1006 (9th Cir. 2005); *California v. Brown*, 479 U.S. 538, 545 (1987) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." (O'Connor, J., concurring)). As such, I find that had Greene had an expert testify not only about his psychological issues during the penalty hearing but also about the relatedness of those psychological issues with his history, drug abuse, and behavior, the jury would have viewed Greene under a more advanced and discerning lens.

Thus, in reweighing the evidence in aggravation against the totality of the new mitigation evidence presented in these grounds, I find that the mitigation evidence likely comes close to counterbalancing the aggravating evidence. *See Wiggins*, 539 U.S. at 534 ("In assessing

prejudice, [this Court] reweigh[s] the evidence in aggravation against the totality of the available mitigating evidence."). As a result, I find that any confidence in the jury's death sentence has been sufficiently undermined and that Greene's penalty hearing cannot be relied on as having produced a just result.[6] I grant Greene relief on grounds 1(a), 1(b), and 1(d).

---

[6] Notably, the dissenting opinion in the Supreme Court of Nevada's Order of Affirmance of Greene's second state post-conviction petition agreed:

> Greene submitted considerable mitigation evidence with his petition that he contended prior counsel failed to discover and present to the jury. Several past psychological evaluations described Greene's marked impulsivity. Further, he had been diagnosed with conduct disorder, persistent depressive disorder, and attention deficit-hyperactive disorder. More recently, evaluating professionals opined that Greene's behavior is significantly influenced by his severe psychological deficits. They asserted that Greene lacked the capacity to transform unacceptable impulses into acceptable behavior. His mood instability, coupled with stress, could result in episodes of bizarre behavior and irrational impulses. Additionally, evaluators opined that he was suffering from the chronic effects of methamphetamine abuse at the time of the crime, and those effects augmented his impulsivity and could have resulted in a delusional experience.
>
> New evidence offered with the petition also showed how the events of his youth aggravated his psychological disorders and how those disorders influenced the delinquent behavior of his youth. Although the jury heard some testimony that Greene had been molested, the new evidence described the abuse in greater detail. Other evidence indicated that Greene had been physically abused by an uncle and sexually assaulted by several neighborhood boys. These events caused Greene to withdraw and become prone to destructive behavior. Greene's father did not seek appropriate counseling for him, or adequately discipline his misbehavior, after he was molested. Records of Greene's expulsions and prior juvenile crimes validate the deleterious effects of his disorders, past abuse, and lack of discipline. It is clear that Greene's neurological deficits persisted until the time of the crime. Those who knew Greene when he lived at the Sunrise Mobile Home Park described him as "gentle, funny, and caring," but was known to become "argumentative, belligerent, paranoid, and violent" as well as "explode in fits of rage."
>
> In its case in aggravation, the State undoubtedly presented every crime or prior bad act for which it could find evidentiary support in its effort to convince the jury to impose death. As well it should have Greene's crimes, whether those charged or not, were egregious. But fairness dictates that competent counsel should have investigated and presented evidence of every mental disorder that troubled Greene, every predator who victimized him as a child, and every failure of his family to address his trauma or remedy his behavior. Therefore, I disagree with the majority's conclusion that counsel's decision not to introduce this testimony was reasonable trial strategy. The majority also concludes that such evidence would not have been persuasive given how Greene's crimes did not appear to be a "rash act." However, mitigation evidence need not excuse or justify the crime. *Hollaway v. State*, 116 Nev. 732, 743, 6 P.3d 987, 995 (2000). It need only provide some "basis for jurors to find the crime mitigated and impose a less severe sentence." *Id.*

ECF No. 111-4 at 15–17.

### 2. Ground 1(c)—failure to present evidence constituting a defense

In ground 1(c), Greene alleges that his trial counsel failed to present evidence that his mental health and drug problems constituted a defense to first-degree murder. ECF No. 119 at 69.

#### a. Relevant Nevada law

Under Nevada law, "[m]urder is the unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied." Nev. Rev. Stat. § 200.010(1). And "[i]ntent to commit murder means the intent to kill someone with malice aforethought." *Keys v. State*, 766 P.2d 270, 272 (Nev. 1988). "[E]xpress malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." Nev. Rev. Stat. § 200.020(1). And implied malice is present "when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart." Nev. Rev. Stat. § 200.020(2). "Malice aforethought may be inferred from the intentional use of a deadly weapon in a deadly and dangerous manner." *Moser v. State*, 544 P.2d 424, 426 (Nev. 1975).

"[T]he technical defense of diminished capacity is not available in Nevada." *Crawford v. State*, 121 P.3d 582, 591 (Nev. 2005); *see also Miller v. State*, 911 P.2d 1183, 1186 (Nev. 1996) (defining the diminished capacity defense as "requir[ing] only a showing of a mental illness that is partially responsible for the defendant's conduct"). However, Nevada law allows a defendant to argue that his or her insanity or intoxication made him or her incapable of forming the intent to commit the crime. *See* Nev. Rev. Stat. § 193.220 ("No act committed by a person while in a state of insanity or voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute a particular species or degree of crime, the fact of his insanity or intoxication may be taken into consideration in determining the purpose, motive or intent.").

#### b. Analysis

Greene argues that his trial counsel should have discovered and recognized that his mental capacity was so diminished at the time of the crime, due to either intoxication or psychological disorders or both, that he was unable to form the requisite intent for murder. ECF No. 119 at 70. I

find that it is beyond belief that evidence of Greene's mental health issues and/or intoxication would have affected the jury's finding that Greene had the intent to kill. The circumstances of the murders show that Greene used a deadly weapon in a deadly and dangerous manner, that the victims did not provoke Greene, that Greene disregarded Farris's attempts to plead for her life, that Greene had time to rethink his actions after the rifle jammed but did not change course, and that Greene acted with an abandoned and malignant heart. Even considering the new evidence discussed within grounds 1(a), 1(b), and 1(d) regarding Greene's psychological and drug issues, I cannot find, based on these facts, that the jurors would have been persuaded that Greene lacked the intent to kill. *See King v. State*, 392 P.2d 310, 311 (Nev. 1964) ("Whether one's intoxication is so gross as to preclude a capacity intentionally to kill is normally a fact issue for the jury to resolve."). As such, due to Greene's failure to demonstrate prejudice under *Strickland*, ground 1(c) is not substantial, so I find that Greene fails to demonstrate requisite prejudice necessary to overcome the procedural default. Ground 1(c) is dismissed.

### 3. Ground 1(e)

In ground 1(e), Greene alleges that his trial counsel was ineffective for failing to (1) explain that Greene was involved with a gang as a result of his need to feel accepted and supported by a group, (2) impeach witness Souza's testimony by inquiring about Souza's drug use on the night of the offense, (3) impeach witness Kristey Dentler by inquiring about Dentler's drug problem, and (4) impeach Anthony Fisher by inquiring about Fisher's drug use and his manipulation of Greene. ECF No. 119 at 118–121.

Even if Greene's trial counsel acted deficiently in failing to explain Greene's gang involvement and to impeach Souza, Dentler, and Fisher, Greene fails to demonstrate prejudice. First, Greene argues that "[i]f the jury had heard that [his] involvement in criminal groups was caused by the deficiencies he suffered in his own family, they would have been less likely to hold his gang involvement against him, and thus less likely to vote for a sentence of death." ECF No. 119 at 118. This argument is entirely speculative and lacks any support, as it is entirely unclear that the jury held Greene's gang affiliation against him in any way given that the murders were not gang

related. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("[P]rejudice is not established by mere speculation.").

Second, Greene argues that "[i]f trial counsel had done a better job of impeaching witnesses, the results of the proceeding would likely have been different." ECF No. 119 at 119. I disagree. Souza's and Fisher's[7] testimonies were not especially critical to the prosecution's case during the guilt phase of the trial in light of Barker's testimony, as is discussed further in ground 3, so Greene fails to demonstrate that the results of his trial and penalty hearing would have been different had these witnesses been impeached with their drug usage. *Strickler v. Greene*, 527 U.S. 263, 293–94 (1999) (finding no prejudice from evidence impeaching a witness where there was strong evidence for conviction separate from the witness's testimony); *see also Doe v. Ayers*, 782 F.3d 425, 431 (9th Cir. 2015) (concluding that the defendant's trial counsel "could have done a much better job of impeaching [the witness], . . . but the failures regarding impeachment of [the witness] are of comparatively little consequence"). Turning to Dentler, she testified as follows during the penalty hearing: (1) Greene told her that he had fired two shots at a man who had disrespected him and then said, "the next time it happened, he would not miss," and (2) Greene fired a gun three times outside her front door after being told not to bring the gun into the house. ECF No. 40-10 at 17–19. Although this testimony supported the prosecution's narrative that Greene was a violent and aggressive individual, Greene fails to demonstrate that impeaching Dentler would have affected the jury's decision. The murders were exceptionally more violent than these two incidents, meaning the evidence in aggravation likely was not tipped much by Dentler's testimony.

As such, due to Greene's failure to demonstrate prejudice under *Strickland*, ground 1(e) is not substantial, so Greene fails to demonstrate requisite prejudice necessary to overcome the procedural default. Ground 1(e) is dismissed.

**B. Ground 2(c)—juvenile records**

In ground 2(c), Greene alleges that his trial counsel was ineffective for failing to move to exclude evidence of his delinquent juvenile behavior and for failing to present evidence that he

[7] Fisher testified that Greene told him "[t]hat he had murdered two people on Sunrise Mountain." ECF No. 39-3 at 14.

functioned at a lower level than his chronological age. ECF No. 119 at 130–32. This court previously found that ground 2(c) was subject to the procedural default doctrine and deferred ruling on the cause and prejudice analysis under *Martinez* until the time of merits review. ECF No. 179 at 25–26.

**1. Background information**

During the penalty phase of the trial, the prosecution called Jack Wheatley. ECF No. 40-8 at 7. Wheatley testified, *inter alia*, to the following: (1) on October 26, 1991, at approximately 12:00 in the afternoon, he was working on a newspaper rack when a "person walk[ed] up behind [him] and says, give me your money," (2) the person had a "gun in his pant waist area, . . . and his hands on it," and (3) another man happened upon the interaction, causing the person with the gun to run away. *Id.* at 8–11. Wheatley testified that he believed the person who accosted him was Greene, who was fifteen years old at the time. *Id.* at 11.

The prosecution then called Howard Jordan, an employee of the State of California Department of Youth Authority, who testified to the following: (1) Greene was committed to the CYA, a juvenile prison system, on March 9, 1992, for attempted robbery with the use of a weapon; (2) Greene was paroled from the CYA in December 1993, and was still on parole when he committed the instant offenses; (3) on September 20, 1989, Greene was charged with discharging a weapon in a negligent manner; (4) on May 9, 1990, Greene was charged with receiving stolen property; (5) on June 18, 1990, Greene was charged with possession and use of a BB gun and shooting at animals; and (6) on August 12, 1990, Greene was charged with grand theft. ECF No. 40-8 at 27–30; ECF No. 40-9 at 2–5. During cross-examination, Greene's trial counsel asked Jordan about Greene's other contacts with law enforcement that did not result in charges being filed, and Jordan testified that (1) Greene's first contact with law enforcement "was for disturbing the peace by a loud and unreasonable noise"; (2) on October 5, 1989, Greene was contacted for breaking into a car; (3) on October 14, 1989, Greene was contacted for being a runaway; and (4) on October 4, 1991, Greene was contacted for cruelty to an animal. ECF No. 40-9 at 9–15.

The prosecution next called Sharon Harada, a probation officer, who testified that she was Greene's probation officer for six months, starting in April 1991, and that Greene was suspended from several schools during that six-month period. ECF No. 40-9 at 17–23.

**2. Analysis**

First, addressing Greene's trial counsel's alleged failure to object and to move to exclude the admission of his juvenile records during the penalty hearing, Greene fails to demonstrate that his trial counsel was ineffective. Under Nevada law, "[a] sentencing court is privileged to consider facts and circumstances which would clearly not be admissible at trial." *Norwood v. State*, 915 P.2d 277, 278 (Nev. 1996). Thus, although Greene's trial counsel certainly could have lodged an objection, it is far from clear that such an objection would have been sustained. *See Johnson v. State*, 148 P.3d 767, 774 (Nev. 2006) (explaining that "Johnson's juvenile record was relevant to his character, revealing a pattern of escalating violent criminal behavior that began with his participation in an armed bank robbery and culminated in the quadruple murder he committed in this case. Although this evidence was prejudicial, it was not unfairly so. And it had significant probative value, showing not only his propensity for violence and gang involvement but also his amenability to rehabilitation—all relevant considerations in the determination of his sentence.").

Second, turning to Greene's trial counsel's alleged failure to present evidence that Greene functioned at a lower level than his chronological age, Greene again fails to demonstrate that his trial counsel was ineffective. Greene "was diagnosed in 1989 as having a Conduct Disorder with Extreme Impulsivity, Attention Deficit Disorder with Hyperactivity and an Antisocial Personality," which, together, "reflect his inability to pay attention or concentrate, plan ahead, delay gratification and *behave in age-appropriate ways*." ECF No. 48-7 at 13 (emphasis added). However, two years later, in 1991, "Greene was described as having efficient cognitive and academic skills to further his education." *Id.* at 11. Further, in 2007, Greene was found to have a "Full Scale I.Q. of 101," meaning he "falls at the 53rd percentile in comparison with his peers and places him in the average range of intellectual functioning." ECF No. 132-1 at 16. Thus, although there is some evidence to support an

argument that Greene had a lower functioning level, this evidence is far from overwhelming, making any prejudice entirely speculative.

As such, ground 2(c) is not substantial, so Greene fails to demonstrate requisite prejudice necessary to overcome the procedural default. Ground 2(c) is dismissed.

### C. Ground 3—*Brady*/*Napue*

In ground 3, Greene alleges that his conviction and death sentence are invalid under federal constitutional guarantees of due process, equal protection, and a reliable sentence due to the State's failure to disclose material exculpatory and impeachment information, and presentation of false testimony, related to benefits that were promised to, and conferred upon, Fisher. ECF No. 119 at 147. Specifically, Greene alleges that newly discovered evidence, which was suppressed by the State, reveals that Fisher received undisclosed benefits in exchange for his testimony against Greene. *Id.* at 148.

#### 1. Background information

At Greene's trial, Fisher testified that Greene told him "[t]hat [Greene] had murdered two people" on Sunrise Mountain. ECF No. 39-3 at 14. When Fisher asked Greene why he murdered the two people, Greene said that "[h]e didn't know, [he] just did it." *Id.* at 14. Fisher testified that Greene did not "exhibit any signs of remorse or emotion." *Id.* at 15. At the end of direct examination, the prosecution asked Fisher if he had "ever been convicted of possession of marijuana," and he answered, "[y]es, I have." *Id.* at 28. Later, on cross-examination, Greene's trial counsel questioned Fisher further on his marijuana conviction:

> Q. Now, you testified - - well, you've been convicted of a drug charge, is that correct?
> A. Yes, sir.
> Q. Okay. What kind of sentence did you receive?
> A. I got three years' probation.
> Q. Okay. Are you on probation now?
> A. Yes, I am.
> Q. Okay. And what is the status of your probation? Are you in good standing, or is a revocation proceeding - -
> A. No. In good standing.
> Q. Has - -
> A. No violations, no.
> Q. Okay. So there's never been any actions taken to revoke your probation and send you to prison?
> A. No. Never.

Q. Okay. Now - - and that's because you've used drugs; correct?
A. That's possession of marijuana.
Q. Right. Was that for the purpose of sale, Mr. Fisher?
A. No, it wasn't.

ECF No. 39-4 at 6–7.

Fifteen years later, in 2010, an evidentiary hearing was held on Greene's second state post-conviction petition. ECF No. 120-18. The prosecutor stated that he "searched diligently all the records of the District Attorney's office and confirmed there is no evidence anywhere that Anthony Fisher received any sort of an inducement or benefit in exchange for his testimony at the trial." *Id.* at 47.

Fisher then testified, *inter alia*, to the following: (1) he was arrested six months before Greene's trial and was charged with manufacturing a controlled substance, trafficking a controlled substance, and child endangerment; (2) after his arrest, he spoke with a law enforcement officer who "state[d] that he wasn't there for" Fisher's drug charges, but he wanted to discuss the murder that Greene had allegedly committed; (3) the law enforcement officer believed that Fisher had supplied the guns to Greene and that if Fisher's fingerprints were found on the guns, "there was going to be another person indicted for murder, which was [him]"; (4) Fisher signed a declaration in 2007 explaining that he told investigators that two men from the District Attorney's Office had visited him before Greene's trial, and they told him that they would go easy on him regarding his drug charges if he agreed to testify at Greene's trial about what Greene had told him; (5) he did not actually read that declaration before signing it; (6) his testimony at the trial was truthful and was not made "in exchange for any kind of an inducement, or hope for some sort of leniency from the DA's office"; (7) he testified at Greene's trial "because [he] thought it was the right thing to do"; and (8) he was convicted of attempted manufacture of methamphetamine, for which he was sentenced to probation, after Greene's trial, the remainder of his felony charges were dropped. *Id.* at 48–80.

### 2. State court determination

In affirming the state court's denial of Greene's second state post-conviction petition, the Supreme Court of Nevada held:

> Greene argues that the district court erred in concluding that he failed to demonstrate good cause and prejudice based on his claim that the State withheld inducements offered to Anthony Fisher in exchange for his testimony. *See State v. Bennett*, 119 Nev. 589, 599, 81 P.3d 1, 8 (2003) ("Good cause and prejudice parallel the second and third *Brady* components; in other words, proving that the State withheld the evidence generally establishes cause, and proving that the withheld evidence was material establishes prejudice."). We disagree. While the State had knowledge of its meetings with Fisher, it was not the exclusive repository of that information. *See Rippo v. State*, 113 Nev. 1239, 1257, 946 P.2d 1017, 1028 (1997) (noting that "a *Brady* violation does not result if the defendant, exercising reasonable diligence, could have obtained the information"). The record indicates that Fisher, his mother, and his girlfriend were present during the visits when Greene alleges that the attorneys offered favorable treatment in exchange for Fisher's testimony. Greene did not allege that an impediment external to the defense prevented him from contacting these witnesses sooner. Moreover, he failed to demonstrate that the additional impeachment evidence was material for two reasons. *See Jimenez v. State*, 112 Nev. 610, 619, 918 P.2d 687, 692 (1996) (noting that when there is a specific request for evidence, materiality is satisfied if there is a reasonable possibility that the omitted evidence would have affected the outcome of trial). First, he did not demonstrate that the State offered Fisher an inducement to testify. At the evidentiary hearing, Fisher denied having any expectation of receiving favorable treatment from the State in exchange for his testimony. The district court found this testimony credible. While this testimony contradicted his prior declaration, the district court was in the best position to assess Fisher's credibility and that determination is entitled to deference so long as it is supported by substantial evidence. *See Little v. Warden*, 117 Nev. 845, 854, 34 P.3d 540, 546 (2001). Second, even if Greene demonstrated the existence of an inducement, this additional impeachment evidence would not have altered the outcome at trial. Greene's admission to Fisher that he killed the victims was persuasive, but not indispensable, evidence. Witnesses saw Greene steal the murder weapon and hide it and one witness saw Greene murder the victims. In addition, Greene admitted involvement in the killings to two other witnesses. Therefore, the district court did not err in denying this claim.

ECF No. 158-8 at 3–4.

### 3. Procedural default

This court reserved ruling on respondents' exhaustion/procedural default arguments regarding ground 3 until after full briefing. ECF No. 179 at 26–27. Greene argues that the Supreme Court of Nevada's application of the default bars to Greene's *Brady* claim was not independent of federal law because it was based on the merits of his federal *Brady* claim. ECF No. 198 at 56. I agree. In *Cooper v. Neven*, the Ninth Circuit held that the Supreme Court of Nevada's decision did not rest

on an independent state ground because "in the context of *Brady* claims, the merits of the claim dovetail exactly with the cause-and-prejudice analysis." 641 F.3d 322, 333 (9th Cir. 2011). Thus, because the Supreme Court of Nevada's decision did not rest on an independent and adequate state ground, it does not bar federal habeas review.

4. ***Brady***

"[T]he suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Because a witness's "'reliability . . . may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the *Brady*] rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82. The materiality of the evidence that has been suppressed is assessed to determine whether prejudice exists. *Hovey v. Ayers*, 458 F.3d 892, 916 (9th Cir. 2006). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Accordingly, a "'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678).

5. ***Napue***

"[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269. This rule applies "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears"

and when "the false testimony goes only to the credibility of the witness." *Id.* A *Napue* violation claim will succeed when "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (internal quotation marks and alternation omitted). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Agurs*, 427 U.S. 97, 103 (1976).

**6. De novo review**

Greene alleges that this court should review this ground de novo because clearly established federal law does not require petitioners to demonstrate the State was the exclusive repository of impeachment evidence, or that they could not have discovered the evidence sooner on their own. ECF No. 198 at 71. The Supreme Court of Nevada stated that "[w]hile the State had knowledge of its meetings with Fisher, it was not the exclusive repository of that information." ECF No. 158-8 at 3 (citing *Rippo*, 946 P.2d at 1028) (noting that "a *Brady* violation does not result if the defendant, exercising reasonable diligence, could have obtained the information")). However, the Supreme Court has stated that "[o]ur decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004). Accordingly, because the Supreme Court of Nevada appears to have absolved the prosecution of its burden to turn over exculpatory and impeachment evidence by way of stating that Greene could have discovered the information on his own, I find that the Supreme Court of Nevada's decision was based on an unreasonable application of federal law. Consequently, I review this ground de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires.").

**7. Analysis**

Greene fails to demonstrate materiality under either *Brady* or *Napue*. Greene contends that Fisher was the only witness who specifically testified that Greene told him he did not know why he

killed the victims and that Greene had no "remorse" when admitting to the offenses, so impeaching him and/or showing that the prosecution allowed him to testify falsely about his criminal record, prejudiced Greene's conviction. ECF No. 198 at 76. Because Barker's testimony affirmatively demonstrated that Greene killed the victims after driving by them by happenstance and laughed about the killings afterwards,[8] Barker's testimony was even more compelling than Fisher's testimony with regard to Greene lacking a basis for the killings and lacking regret. Accordingly, Fisher's testimony was not especially critical to the prosecution's case in light of Barker's testimony. *See Smith v. Cain*, 565 U.S. 73, 76 (2012) ("[O]bserv[ing] that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."); *cf. Banks v. Dretke*, 540 U.S. at 700–01 (holding that impeachment evidence was material where it pertained to a witness whose testimony, which was "uncorroborated by any other witness," was "crucial to the prosecution"); *Wearry v. Cain*, 577 U.S. 385, 393 (2016) (determining that there was a lack of confidence in the jury's verdict due to the suppression of evidence related to two witnesses' motivations for testifying because "the only evidence directly tying [the defendant] to th[e] crime was [one witness's] dubious testimony, corroborated by the similarly suspect testimony of [the other witness]"); *Hayes*, 399 F.3d at 985 (finding suppressed evidence material where tainted witness's testimony "was the centerpiece of the prosecution's case" and "[n]early all of the other evidence against [the defendant] was circumstantial"); *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005) ("Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case.").

Greene is not entitled to federal habeas relief for ground 3.

---

[8] Barker testified that (1) Greene stated that "he was wondering what size of a hole the gun would put if he hit something with it, if he shot it"; (2) Greene told Winfrey to stop the car when Greene saw the victims; (3) Greene exited the car, walked over to the victims, and shot the man; (4) while the woman was pleading for her life, Greene told her to "shut up, bitch" and shot her too; and (5) following the killings, Greene laughed while "talking about how it looked when [the man's] eyeball popped out of his head" and "how the blood bubbled out of [the woman's] neck when he shot her." ECF Nos. 39-5 at 26, 28, 30; 39-6 at 4–6.

### D. Ground 5—Nevada law on first-degree murder

In ground 5, Greene alleges that the offense of first-degree murder, as interpreted by the Supreme Court of Nevada and defined by the jury instructions, was unconstitutionally vague or, in the alternative, the jury instructions relieved the State of proving every element of the offense. ECF No. 119 at 190.

#### 1. Relevant jury instructions

Jury Instruction No. 15 provided that "[m]urder of the First Degree is the willful, deliberate and premeditated killing of another human being." ECF No. 21-11 at 17. Jury Instruction No. 21 provided that "[m]urder of the Second Degree is murder with malice aforethought, but without the admixture of premeditation. All murder which is not Murder of the First Degree is Murder of the Second Degree." *Id.* at 23. And Jury Instruction No. 16 provided as follows:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing. Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

*Id.* at 18. Jury Instruction No. 16 is known as the *Kazalyn* instruction. *See Kazalyn v. State*, 825 P.2d 578, 583 (Nev. 1992).

#### 2. History of the *Kazalyn* instruction

In 2000, three years after the Supreme Court of Nevada affirmed Greene's judgment of conviction, in *Byford v. State*, the Supreme Court of Nevada abandoned the *Kazalyn* instruction: "By defining only premeditation and failing to provide deliberation with any independent definition, the *Kazalyn* instruction blurs the distinction between first- and second-degree murder." 994 P.2d 700, 713 (Nev. 2000) (explaining that "[d]eliberation remains a critical element of the mens rea necessary for first-degree murder, connoting a dispassionate weighing process and consideration of consequences before acting").

In *Polk v. Sandoval*, the Ninth Circuit considered the constitutional implications of the *Kazalyn* instruction and concluded that it was "clearly defective because it relieved the state of the

burden of proof on whether the killing was deliberate as well as premeditated." 503 F.3d 903, 910 (9th Cir. 2007). In so doing, the Ninth Circuit read *Byford* as a statement of what Nevada law had always been, noting that "[i]n *Byford*, the Supreme Court of Nevada reaffirmed that '[i]t is clear from the statute that *all three elements*, willfulness, deliberation, and premeditation, must be proven beyond a reasonable doubt before an accused can be convicted of first-degree murder.'" *Id.* (emphasis in original).

The Supreme Court of Nevada disapproved of *Polk*, concluding that "*Byford* announced a change in state law," explaining that "the *Kazalyn* instruction correctly reflected Nevada law before *Byford*." *Nika v. State*, 198 P.3d 839, 849–50 (Nev. 2008). The Supreme Court of Nevada also reaffirmed that "*Byford* has no retroactive application on collateral review." *Id.* at 850.

Following *Nika*, the Ninth Circuit determined that *Polk* was no longer good law, explaining that "*Nika* made clear that *Byford* represented a change in the law, and that any language in *Byford* suggesting it was a clarification was dicta." *Babb v. Lozowsky*, 719 F.3d 1019, 1029 (9th Cir. 2013), *overruled on other grounds by*, *Moore v. Helling*, 763 F.3d 1011 (9th Cir. 2014).

**3. Standard for jury instruction review**

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error."). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)). And significantly, when reviewing a jury instruction, this court considers that jury instruction "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72; *see also United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) ("In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation."). Even if an instruction contains a constitutional error, the court must then "apply the harmless-error

analysis mandated by *Brecht*" *v. Abrahamson*, 507 U.S. 619 (1993). *Calderon v. Coleman*, 525 U.S. 141, 146 (1998). The question is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 145.

### 4. State court determination

In its order affirming Greene's judgment of conviction, the Supreme Court of Nevada held:

> Greene contends that the jury instructions regarding homicide were improper because the terms premeditated, deliberate and willful were not clarified for the jury. Greene asserts that these three terms constitute "necessary and distinct elements to the crime of First Degree Murder. The use of the conjunctive 'and' crystallizes that the elements are separate and each one is required to support a verdict of murder in the first degree." Greene claims that because these terms were not defined separately, the distinction between first and second degree murder was not clear to the jury.
>
> Jury instructions relating to intent must be read together, not disconnectedly, and a single instruction to the jury may not be judged in isolation, but must be viewed in context of the overall charge. *Rose v. State*, 86 Nev. 555, 558, 471 P.2d 262, 264 (1970).
>
> In *Powell v. State*, 108 Nev. 700, 838 P.2d 921 (1992), *overruled on other grounds*, 511 U.S. 79 (1994), this court reiterated that premeditation and deliberation constitute a single term and not separate elements requiring separate thought processes. *Id.* at 708, 838 P.2d at 926–27 (citing *Briano v. State*, 94 Nev. 422, 581 P.2d 5 (1978)). After reviewing the law in other jurisdictions, this court further concluded that the terms premeditated, deliberate and willful are a single phrase, meaning simply that the actor intended to commit the act and intended death as the result of the act. *Id.* at 709, 838 P.2d at 927.
>
> In the instant case, we conclude that the jury instructions regarding homicide comport with the law. The requirements for first-degree murder were clearly outlined, and the distinction between first- and second-degree murder was explicit. Thus, Greene's contention that the jury instructions were improper lacks merit.

ECF No. 43-3 at 17–18.

### 5. Ground 5(a)—void for vagueness

In ground 5(a), Greene alleges that Nevada law defining first-degree murder at the time of his trial was unconstitutionally vague and overbroad. ECF No. 119 at 194.

"[T]he Government violates [due process of law] by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S.

591, 595 (2015); *see also Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03 (1966) ("It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legal fixed standards, what is prohibited and what is not in each particular case."). This principle applies "to statutes defining elements of crimes" and "to statutes fixing sentences." *Johnson*, 576 U.S. at 596. Regarding the former, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also Hess v. Bd. of Parole & Post-Prison Supervision*, 514 F.3d 909, 913 (9th Cir. 2008) ("[A] state law must establish adequate guidelines to govern the exercise of discretion by state officials so that the law neither 'authorizes [n]or even encourages arbitrary and discriminatory enforcement.'" (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000))).

The *Kazalyn* instruction defined deliberation as a part of premeditation, rather than as a separate element. However, the fact that Nevada law did not require the prosecution to prove deliberation as a discrete mens rea element at the time of Greene's trial does not mean that the distinction between first- and second-degree murder as outlined in Greene's jury instruction was vague. The jury was instructed that second-degree murder is the unlawful killing of a human being with malice aforethought, meaning with the intentional doing of a wrongful act without legal cause or excuse. Comparatively, the jury was instructed that first-degree murder is the unlawful killing of a human being with malice aforethought and premeditation, meaning a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing. The addition of premeditation for first-degree murder as compared to second-degree murder renders these categories of murder distinct. Indeed, second-degree murder does not require a determination to kill, meaning the definition of first-degree murder, which does require such a determination, is not vague.

### 6. Ground 5(b)—retroactive application of *Byford*

In ground 5(b), Greene alleges that he was entitled to a retroactive application of the substantive change in law announced in *Byford*. ECF No. 119 at 196 (citing *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) ("New *substantive* rules generally apply retroactively." (emphasis in original))).

In *Babb*, the Ninth Circuit stated that "*Byford*'s decision . . . represented a change in, rather than a clarification of, the law," meaning the retroactive implications of *Byford* were not assumed. 719 F.3d at 1028 ("Whether a particular decision represents a change in, or clarification of, the law is a matter of state law"); *see also Apprendi v. New Jersey*, 530 U.S. 466, 484–87 (2000) (providing that states are free to define the elements of state crimes). As such, in deciding the due process implications of the *Kazalyn* instruction, the Court in *Babb* implicitly agreed with the Supreme Court of Nevada that *Byford* does not have retroactive application. *See Babb*, 719 F.3d at 1029; *Nika*, 198 P.3d at 850 ("*Byford* has no retroactive application on collateral review"). This court is bound by the holding in *Babb* with respect to pre-*Byford* cases involving the *Kazalyn* instruction.

### 7. Ground 5(c)—burden of proof

In ground 5(c), Greene alleges that if Nevada law has always required proof of all three elements—willfulness, premeditation, and deliberation—then the *Kazalyn* instruction relieved the prosecution of that burden of proof. ECF No. 119 at 199.

A petitioner's due process rights are violated where a jury instruction "ha[s] the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind." *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979); *see also In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *Evanchyk v. Stewart*, 340 F.3d 933, 939 (9th Cir. 2003) ("It is a violation of due process for a jury instruction to omit an element of the crime.").

As the Ninth Circuit has already determined, "under pre-*Byford* law, premeditation, deliberation and willfulness were not distinct and independent elements of first degree murder," so "before *Byford* was decided, the *Kazalyn* instruction did not improperly relieve the State of the

burden of proving all the elements of first degree murder." *Babb*, 719 F.3d at 1028. Because Nevada law has not always required proof of all three elements—willfulness, premeditation, and deliberation—given that they were combined as one under Nevada law from 1992 until 2000, the prosecution was not relieved of its burden of proof.

**8. Ground 5(d)—harmlessness**

Even if this court agreed with Greene that the *Kazalyn* instruction rendered Nevada law on first-degree murder unconstitutionally vague, that *Byford* should have been applied retroactively, or that Nevada law always required proof of all three elements, I find that such error did not have a substantial and injurious effect or influence in determining the jury's verdict. Indeed, given Greene's actions on the night of the murders, the prosecution demonstrated that he acted with premeditation and deliberation.

**9. Conclusion**

In light of the holdings in *Nika* and *Babb*, the Supreme Court of Nevada reasonably concluded that the *Kazalyn* instruction given at Greene's trial was an accurate statement of Nevada law at the time it was given, so the trial court's use of that instruction did not violate Greene's federal constitutional right to due process. *Estelle*, 502 U.S. at 72. Accordingly, because the Supreme Court of Nevada's ruling was not contrary to, or an unreasonable application of, federal constitutional law, Greene is not entitled to federal habeas relief for ground 5.

**E. Ground 6—prosecutorial misconduct**

In ground 6, Greene argues that his conviction and death sentence are invalid under federal constitutional guarantees of due process, equal protection, and a reliable sentence due to the overreaching and misconduct of the prosecution that distorted the fact-finding process and rendered his conviction and sentence fundamentally unfair. ECF No. 119 at 206.

**1. Standard for prosecutorial misconduct claims**

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with

unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In making that determination, this court looks to various factors: "the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in summation and whether defense counsel had an adequate opportunity to rebut the comment." *Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020) (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637–38).

**2. Ground 6(a)—improper arguments**

In ground 6(a), Greene alleges that the prosecution committed misconduct during its opening statements and closing arguments. ECF No. 119 at 207.

**a. Background information**

During opening statements of the guilt phase of the trial, the prosecution made the following comment: "This defendant thought what he had done on Sunrise Mountain was funny. He laughed about it. He laughed about it with Leonard Winfrey. He was so excited, he was having so much fun shooting that mini-14 assault rifle. This was fun for this defendant." ECF No. 38-6 at 27. Greene's trial counsel objected that this was "argument, not opening statement," but the trial court overruled the objection. *Id.* The prosecution then commented, "what Heather had seen was horrible, it was brutal, and it was done for no reason." *Id.* at 31. Greene's trial counsel again objected, and the trial court sustained the objection. *Id.* Immediately thereafter, the prosecution stated, "[t]his defendant killed two innocent people for absolutely no reason, just for the hell of it." *Id.* Greene's trial counsel objected, and the trial court told the prosecutor to "[k]eep it to what the evidence will show." *Id.* The prosecution then commented that the victims' "lives came to an abrupt end because of the selfishness and cold-bloodedness of that individual." ECF No. 38-7 at 2. Greene's trial counsel objected, and the objection was sustained. *Id.* Immediately thereafter, the prosecution

stated, "someone said that the killing of an innocent person is the ultimate evil. The evidence in this case will show that on September 23rd, 1994, this defendant committed the ultimate evil, not once, but twice." *Id.* Greene's trial counsel objected, and the trial court sustained the objection and admonished the jury that "arguments of counsel are not evidence . . . and neither are the personal beliefs of counsel." *Id.*

Later, during closing arguments of the guilt phase of the trial, the prosecution argued that the victims "were murdered because two people, one of whom sits in this courtroom, wanted to have fun that night, looking for some excitement, was infatuated with a mini-14. They were murdered for the hell of it." ECF No. 40-2 at 11. The prosecution argued that Greene thought the killings were funny and characterized the killings as "this horrible killing, these horrible killings." *Id.* at 20–21. He then characterized the killings as "brutal and yet so very casual." ECF No. 40-3 at 6. The prosecution also argued that Greene "can blame Winfrey, . . . can blame this character named Sid that he told Detective Ramos about, but [Greene] knows that when he looks in the mirror he sees the killer of those two people." ECF No. 40-2 at 28.

Moreover, during closing arguments of the guilt phase of the trial, the prosecution argued that Barker had "a lot of courage to come into this courtroom and in front of the defendant [to] testify to what she had seen on September 23rd, 1994," asking why she would "go into three separate proceedings, subject yourself to embarrassing questions on cross-examination, several hours of questioning, and say what you saw with regard to these horrible crimes, if it weren't the truth?" ECF No. 40-3 at 28–29. Similarly, the prosecution argued the following regarding Barker:

> The pictures of Chris and Deborah laying on the ground with holes in their head and their neck is just not right, they did not deserve to die; they did absolutely nothing to justify what was done to them. Maybe Heather– in trouble and no doubt scared, finally realized what the right thing to do was. Heather could have kept her knowledge to herself, no one could have forced her to give up the defendant and Leonard Winfrey; and she gives up both those individuals.

ECF No. 40-3 at 29. The prosecutor submitted that Barker would "never forget what she saw for the remainder of her life." ECF No. 40-4 at 3.

During rebuttal argument, the prosecution argued:

> I submit to you, ladies and gentlemen, the evidence suggests that this was fun for the defendant. He got to see just how big a hole that mini-14 would make in something. Except this something wasn't shooting off a balcony or shooting out a car window or into a piece of wood or at a bottle, it was into the head and the neck of two living and breathing human beings, one of whom was begging for her life. The combination of weapons, blood, bullets, photographs, they paint a mural, or a picture, of pure horror. This defendant is the artist responsible for that picture. What is shown in those photographs that I showed you a moment ago caused this defendant to laugh and to drive away from that crime scene; this is what caused the defendant to laugh and joke about the condition of the poor man's eye and the condition of Deborah Farris. Defendant found this funny. The family of Deborah Farris isn't laughing, and the family of Christopher Payton isn't laughing.

ECF No. 40-4 at 10–11. Greene's trial counsel objected, and the trial court sustained the objection. *Id.* at 11.

**b. State court determination**

In its order affirming Greene's judgment of conviction, the Supreme Court of Nevada held:

> Greene contends that the prosecutor committed misconduct during the opening statement by making the following remarks:
>
> > Prior to going to Leonard Winfrey's apartment and after the killing of this young couple this defendant laughed while in that Camaro. He laughed about how the man looked when his eye popped out after he was shot and killed, and he laughed about how Deborah Farris looked with the blood gushing from her neck. This defendant thought what he had done on Sunrise Mountain was funny. He laughed about it. He laughed about it with Leonard Winfrey. He was so excited, he was having so much fun shooting that mini-14 assault rifle. This was fun for this defendant.
> > MR. SCHIECK [defense counsel]: Your honor, I'm going to object. This is argument, not opening statement.
> > THE COURT: Overruled.
> > . . .
> > And what Heather had seen was horrible, it was brutal, and it was done for no reason.
> > MR. SCHIECK: Going to object, Your Honor. This is argument, Your Honor.
> > THE COURT: Sustained.
> > MR. SCHWARTZ [prosecutor]: This defendant killed two innocent people for absolutely no reason, just for the hell of it.
> > MR. SCHIECK: Your Honor, again I'm going to object. This is argument.
> > THE COURT: Keep it to what the evidence will show, Mr. Schwartz.
> > . . .

> Their lives came to an abrupt end because of the selfishness and cold-bloodedness of that individual.
> MR. SCHIECK: Going to object, Your Honor. Again, this is argument. And ask the jury be admonished.
> THE COURT: Sustained.
> MR. SCHWARTZ: . . . Two innocent people were killed on September 23, 1994. And someone said that the killing of an innocent person if the ultimate evil. The evidence in this case will show that on September 23, 1994, this defendant committed the ultimate evil, not once, but twice.
> MR. SCHIECK: Going to object again, Your Honor. This is improper opening statement.
> THE COURT: Sustained. Ladies and gentlemen, arguments of counsel are not evidence, as I've told you earlier, and neither are the personal beliefs of counsel as to - - as to the implications of that evidence.

Greene asserts that the prosecutor "engaged in prejudicial, passionate and improper argument to the jury under the guise of an opening statement. The impact of this argument infected the entire proceeding and violated Greene's right to due process and a fair trial."

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985). In addition, should this court determine that improper comments were made by the prosecutor, "it must be . . . determined whether the errors were harmless beyond a reasonable doubt." *Witherow v. State*, 104 Nev. 721, 724, 765 P.2d 1153, 1155 (1988). The Constitution guarantees a fair trial, not necessarily a perfect trial. *Ross v. State*, 106 Nev. 924, 927, 803 P.2d 1104, 1105 (1990). It is not enough that the prosecutor's remarks are undesirable. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Thus, the relevant inquiry is whether the prosecutor's statements so infected the proceedings with unfairness as to make the results a denial of due process. *Darden*, 477 U.S. at 181.

We conclude that the prosecuting attorney's remarks did not rise to the level of improper argument that would justify overturning the conviction. The only patently improper statement is the reference to the "selfishness and cold-bloodedness" of Greene. A prosecutor has the duty to refrain from stating facts in opening statement that he cannot prove at trial. *Lord v. State*, 107 Nev. 28, 32, 806 P.2d 548, 551 (1991). None of the other statements are manifestly improper or constituted misconduct. As to the first set of remarks, the prosecutor did show that the murders were committed for no reason, *i.e.*, without any apparent motive. As to the last remark, the prosecutor did later prove that Greene committed murder, "the ultimate evil," not once, but twice. Further, the defense received the benefit of a jury admonishment, which, in this instance, is sufficient to remove any prejudice. Moreover, even if this court concluded that the above-referenced statements constituted prosecutorial misconduct, such misconduct was harmless beyond a reasonable doubt in light of the overwhelming evidence of guilt against Greene. *See Lay*, 110 Nev. at 1193–94, 886 P.2d at 450–51.

However, this court cannot condone the prosecutor's behavior during his opening statement. He ignored the district judge's repeated admonitions to confine the State's opening remarks to what the evidence would show and to refrain from

> injecting personal beliefs into his statements. All attorneys making presentations before the courts of law of this state have a solemn duty to respect admonitions issued by members of the bench and may be disciplined for ignoring such rulings. *See* SCR 39; SCR 99. As representatives of the state, prosecutors have a special, heightened duty of fairness and responsibility, particularly in capital cases. *See Emerson v. State*, 98 Nev. 158, 164, 643 P.2d 1212, 1215–16 (1982) (citing *Berger v. U.S.*, 295 U.S. 78, 88 (1935)); SCR 173; SCR 250. We issue a stern warning to trial attorneys that improper opening statements and failure to observe the admonitions of the trial judge will not be tolerated and that this court will act whenever appropriate to deter such breaches of conduct. We fine the prosecutor $250 for his improper behavior. *See* SCR 39; SCR 99; SCR 102; *Young v. Ninth Circuit Judicial Dist. Court*, 107 Nev. 642, 818 P.2d 844 (1991).

ECF No. 43-3 at 18–21.

In its order affirming Greene's judgment of conviction, the Supreme Court of Nevada also held:

> Greene contends that the prosecutor committed misconduct during closing statement at the guilt phase of Greene's trial by stating:
>
> > What is shown in these photographs that I showed you a moment ago caused this defendant to laugh and drive away from the crime scene; this is what caused the defendant to laugh and joke about the condition of the poor man's eye and the condition of Deborah Farris. Defendant found this funny. The family of Deborah Farris isn't laughing, and the family of Christopher Payton isn't laughing.
> > MR. SCHIECK: I'm going to object, Your Honor, to - -
> > THE COURT: Sustained.
>
> Greene argues that the prosecutor improperly referred to victim impact evidence with this statement.
>
> These statements do not constitute victim impact evidence. The prosecutor did not refer to the effects of the murders on the victims' families and how much they are grieving their losses. Here, the prosecutor's statement is a rhetorical comparison relating to Greene's complete lack of remorse and lack of value for human life. It does not rise to the level of improper argument as Greene contends. Further, even if the statement amounted to prosecutorial misconduct, it is harmless beyond a reasonable doubt. *Young*, 470 U.S. at 11; *Lay*, 110 Nev. at 1194, 886 P.2d at 451.

*Id.* at 21–22.

### 3. Analysis

In its order on the State's motion to dismiss, "[t]he Court . . . dismiss[ed] all of Claim 6A except the claims that the prosecution made improper arguments in its opening statement in the guilt phase of the trial and improper arguments concerning victim impact in its closing argument in the guilt phase of the trial." ECF No. 179 at 29.

Turning first to the prosecution's arguments during its opening statement in the guilt phase of the trial, Greene alleges that the prosecutor repeatedly expressed personal opinions on the facts of the case and inflamed the jury. ECF No. 119 at 207–09. The Supreme Court of Nevada reasonably concluded that the prosecution's statements did not rise to the level of improper argument that would justify overturning Greene's conviction. The prosecution stated that (1) Greene laughed about the murders and committed them for fun with no motive, (2) the murders were brutal, and (3) Greene was selfish and coldblooded. Even if these first two statements may have inflamed the jury, they did not improperly do so because they were shown to be true based on the evidence presented at trial. *See United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005) ("We have consistently cautioned against prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury[.]"); *Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (concluding that the State's improper closing argument did not infect the trial with unfairness because "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence"). Regarding the third statement, the Supreme Court of Nevada reasonably noted that it was improper. Indeed, it was merely the prosecution's personal belief that Greene was selfish and coldblooded. *See United States v. Young*, 470 U.S. 1, 8–9 (1985) ("[P]rosecutor[s] must refrain from interjecting personal beliefs into the presentation of [the] case."). However, the jury was duly instructed that "[s]tatements, arguments and opinions of counsel are not evidence in this case." ECF No. 21-11 at 40. Further, due to this substantial evidence of Greene's guilt, it cannot be concluded that this brief improper statement "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637–38; *see also Allen*, 395 F.3d at 998 (finding that prosecutorial misconduct did not amount to a due process

violation where the trial court gave an instruction that the attorneys' statements were not evidence and where the prosecutors presented substantial evidence of the defendant's guilt).

Now turning to the prosecution's arguments concerning victim impact in its closing argument in the guilt phase of the trial, the Supreme Court of Nevada reasonably concluded that the following statement did not amount to victim-impact evidence: "Defendant found this funny. The family of Deborah Farris isn't laughing, and the family of Christopher Payton isn't laughing." ECF No. 40-4 at 11. As the Supreme Court of Nevada reasonably determined, this statement was a mere rhetorical comparison used to highlight Greene's lack of remorse; it did not articulate the victims' families' specific harm suffered from the murders. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991) ("Victim impact evidence is simply [a] form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities."); *see also* Nev. Rev. Stat. § 176.015(3)(b) ("[T]he court shall afford the victim an opportunity to . . . [r]easonably express any views concerning the crime, the person responsible, the impact of the crime on the victim and the need for restitution.").

Because the Supreme Court of Nevada's determination constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts, Greene is not entitled to federal habeas relief for ground 6(a).

### 4. Ground 6(b)—elicitation of improper evidence

In ground 6(b), Greene alleges that the prosecution committed misconduct by eliciting improper evidence from Souza. ECF No. 119 at 214.

#### a. Background information

During the prosecution's direct examination of Souza, the following colloquy occurred:

Q: Okay. Did the defendant ever relate anything to you about what was going to happen later on?
A: No.
Q: Did there come a time when the defendant said something that made you nervous?
A: Yes, he wasn't finished here with what he was doing.
Q: And when he said he wasn't finished with what he was doing --
[Defense counsel]: Your Honor, I'm going to object. Could we have some foundation as to --
THE COURT: Sustained.

[Defense counsel]: -- when this statement was made?
THE COURT: Sustained.
Q: When did the defendant say he wasn't finished with what he was doing?
A. When Leonard - - when they were talking, him and Leonard.
Q. And this was at Leonard's apartment?
A. Yes, it was.
Q. The same night that you had watched the evening news?
A. That is correct.
Q. How much after the evening news did he make that statement, roughly?
A. After I watched it, after like maybe an hour.
Q: Okay. And he said that he wasn't finished with what he was doing?
A: That is correct.
Q: What was it that he wasn't finished doing?
[Defense counsel]: Going to object, Your Honor, it calls for --
THE COURT: Sustained.
[Defense counsel]: -- speculation.
THE COURT: Sustained --
Q: What else did the defendant say with regard to what he wasn't finished doing? You said he wasn't finished with what he was doing.
A: Well, from what I was told from Leonard --
[Defense counsel]: Objection, Your Honor, to what he was told from Leonard.
THE COURT: Sustained. Don't tell us what Leonard told you.
Q: What was said by the defendant while you were there and Leonard was there, about not being finished with what he was doing?
A: That's all he said, he just wasn't finished with what he was doing.
Q: Okay. Did there come a time when either Leonard Winfrey or the defendant made a comment regarding what they weren't finished doing, without telling us what was said yet, yes or no?
A: No.
Q: You don't recall anybody ever saying what they were going to continue doing?
A: Killing.
[Defense counsel]: Objection, Your Honor, ask that it be stricken.
THE COURT: Sustained. . . . [J]ury will disregard the last statement of the witness.
Q: Mr. Souza, did there come a time during this discussion regarding what they were going to continue doing when both the defendant and Leonard Winfrey were in your presence?
A: I can't recall.

ECF No. 38-12 at 25–28. And a few minutes later, the following colloquy took place:

Q: Okay. Do your parents still reside in Las Vegas?
[Defense counsel]: Objection, relevance, Your Honor.
THE COURT: Overruled.
THE WITNESS: Yes, they do.
Q: Was it your choice not to stay with your parents?

| | |
|---|---|
| A: | No, it was my parents' choice. |
| Q: | Okay. Do you know the reason? |
| [Defense counsel]: | Objection -- |
| THE WITNESS: | 'Cause they're scared. |
| THE COURT: | Sustained. |

*Id.* at 31.

**b. State court determination**

In its order affirming Greene's judgment of conviction, the Supreme Court of Nevada held:

> Greene asserts that the prosecutor improperly elicited testimony from witness Phil Souza, appellant Winfrey's roommate at the time of the murders, which constituted prior bad act evidence not falling under any exception enumerated in NRS 48.045(2).
>
> NRS 48.045(2) provides:
>
> > Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
>
> Although evidence may be admissible under the exceptions cited in NRS 48.045(2), the determination whether to admit or exclude evidence of separate and independent criminal acts rests within the sound discretion of the trial court, and it is the court's duty to strike a balance between probative value and its prejudice dangers. *Petrocelli v. State*, 101 Nev. 46, 52, 692 P.2d 503, 508 (1985).
>
> We conclude that Souza's testimony does not constitute improper prior bad act evidence as Greene contends. The prosecutor's elicitation of Souza's testimony that Greene was not finished "killing" is admissible as evidence of Greene's conspiracy with Winfrey to commit murder, one of the charges against him. If this evidence was improper for any reason, Greene received the benefit of a jury admonishment and therefore, there is no error.
>
> Greene also contends that other testimony given by Souza was improper witness intimidation evidence because "the prosecutor obviously intended to imply to the jury that Greene was the source of the threat to Souza's parents." Greene assets that there is no evidence to corroborate such an implication.
>
> A prosecutor's references to or implications of witness intimidation by a defendant is reversible error unless the prosecutor also produces substantial credible evidence that the defendant was the source of the intimidation. *Lay v. State*, 110 Nev. 1189, 1193–94, 886 P.2d 448, 450–51 (1994).
>
> Greene's argument with Souza's testimony that his parents were "scared" qualifies as evidence of witness intimidation by Greene is tenuous. At worst, this constitutes a single, indirect reference to witness intimidation by Greene. Moreover, there is no implication that Souza was reluctant to testify because of fear of retaliation by Greene. After listening to Souza's testimony, one might even

> reach the conclusion that Souza's parents are scared of Souza himself. Accordingly, we conclude that even if this qualifies as improper witness intimidation evidence, it is harmless beyond a reasonable doubt. *Id.*, 886 P.2d at 450 – 51.

ECF No. 43-3 at 13–14.[9]

**c. Analysis**

I find that the Supreme Court of Nevada reasonably determined that the prosecution's elicitation of Souza's testimony that Greene was not finished killing did not amount to prosecutorial misconduct. The prosecution clearly started off asking Souza about a statement made directly by Greene. Souza testified that Greene "said he wasn't finished with what he was doing." The prosecution clarified when this statement was made and then attempted to determine what task Greene had not finished. Souza started to explain what he had heard from Winfrey about Greene's statement, but following a hearsay objection, the prosecution re-asked the question more clearly, questioning whether Greene had personally stated what he had not finished. When Souza answered in the negative, the prosecution then attempted to help Souza remember by asking, "[y]ou don't recall anybody ever saying what they were going to continue doing." Even if Souza responded by simply saying "[k]illing" without stating who specifically said this and whether Souza was present when the comment was made, the prosecution acted reasonably in attempting to properly elicit testimony of Greene's statement. Further, as the Supreme Court of Nevada reasonably noted, even if the prosecution acted unreasonably, the trial court told the jury to disregard Souza's "[k]illing" response. Accordingly, Greene fails to demonstrate that the prosecution's actions infected his trial with unfairness in violation of due process.

Next, I find that the Supreme Court of Nevada reasonably determined that the prosecution's elicitation of Souza's testimony that Souza's parents were scared did not amount to prosecutorial misconduct. Indeed, as the Supreme Court of Nevada reasonably noted, Souza's testimony that his parents were scared to let him stay with them during Greene's trial fails to rise to

---

[9] Greene argues that this ground should be reviewed de novo because the Supreme Court of Nevada assessed whether the evidence was properly admitted, not whether there was prosecutorial misconduct. ECF No. 198 at 105. I find that the Supreme Court of Nevada properly analyzed this claim as a prosecutorial misconduct claim. The Supreme Court of Nevada merely discussed whether the evidence was admissible in its assessment of whether the prosecution acted improperly.

the level of Greene threatening a witness. Indeed, even if this testimony was construed by the jury as Souza's parents being afraid of Greene, it falls short of demonstrating that Greene acted to intimidate Souza's parents, rather than, for example, Souza's parents simply being apprehensive about being connected with a murder case. Thus, again, Greene fails to demonstrate that the prosecution's actions infected his trial with unfairness in violation of due process.

Because the Supreme Court of Nevada's determination constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts, Greene is not entitled to federal habeas relief for ground 6(b).

#### 5. Ground 6(c)—*Brady*

In ground 6(c), Greene alleges that the prosecution committed misconduct by failing to disclose material exculpatory and impeachment evidence regarding the benefits received by Fisher on his pending criminal offenses. ECF No. 119 at 218–219. Even if the prosecutor committed misconduct regarding the lack of disclosure of information regarding Fisher, Greene fails to demonstrate that the misconduct "had a substantial and injurious effect or influence in determining the jury's verdict" for the reasons discussed in ground 3, *supra*, *Brecht*, 507 U.S. at 637–38.

### F. Ground 7—random and without apparent motive aggravator

In ground 7, Greene alleges that the random and without apparent motive aggravating circumstance is unconstitutional. ECF No. 119 at 221. Specifically, Greene alleges that this aggravator is unconstitutional on its face because it is vague, is unconstitutional as applied to this case, shifts the burden of proof to him to establish a motive for the homicides, burdens his right to present a defense by disputing the motive argued by the prosecution, burdens his right against self-incrimination, and punishes the absence of a motive. *Id.* at 221–30.

#### 1. Background information

In penalty-phase Jury Instruction No. 11, the jury was instructed as follows:

> You are instructed that the following factors are circumstances by which Murder of the First Degree may be aggravated:
>
> 1. The murder was committed to avoid or prevent a lawful arrest or to effect an escape from custody.
> 2. The murder was committed upon one or more persons at random and without apparent motive.

> 3. The defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first degree.

ECF No. 41-2 at 14. And penalty-phase Jury Instruction No. 13 provided that "[t]he burden rests upon the prosecution to establish any aggravating circumstance beyond a reasonable doubt." *Id.* at 16. On the jury's special verdict form, the foreman indicated that the jury found the following two aggravating circumstances to be present in both murders: (1) "[t]he murder was committed upon one or more persons at random and without apparent motive," and (2) "[t]he defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first degree." ECF Nos. 41-2 at 28; 41-3 at 10.

**2. State court determination**

In its order affirming Greene's judgment of conviction, the Supreme Court of Nevada held:

> Greene contends that NRS 200.033(9), the "at random and without apparent motive" aggravating factor for murder, is unconstitutional. He argues that it is vague and ambiguous, and that it violates the Fifth and Eighth Amendments.
>
> NRS 200.033(9) provides that one of the circumstances by which a first degree murder may be aggravated is that the "murder was committed upon one or more persons at random and without apparent motive." A state authorizing capital punishment has a constitutional duty to tailor its law to avoid the arbitrary and capricious inflection of the death penalty. *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). We have examined the constitutionality of the death penalty statute as a whole:
>
> > Nevada's capital punishment law was amended in 1977 with inconsequential revisions from the death penalty statutes in Georgia and Florida. Georgia and Florida statutes survived constitutional scrutiny by the United States Supreme Court and satisfied the constitutional deficiencies enunciated in *Furman*. *Gregg v. Georgia*, 428 U.S. 153, 196–207 (1976); *Profitt v. Florida*, 428 U.S. 242, 251–53 (1976).
>
> *Deutscher v. State*, 95 Nev. 669, 676, 601 P.2d 407, 412 (1979), *vacated on other grounds*, 500 U.S. 901 (1991). This court has also upheld the constitutionality of NRS 200.033(9), as applied, on numerous occasions. *See, e.g.*, *Lane v. State*, 110 Nev. 1156, 881 P.2d 1358 (1994); *Paine v. State*, 110 Nev. 609, 877 P.2d 1025 (1994), *cert. denied*, [514 U.S. 1038], 115 S. Ct. 1405 (1995); *Moran v. State*, 103 Nev. 138, 734 P.2d 712 (1987); *Ford v. State*, 102 Nev. 126, 717 P.2d 27 (1986). Because Nevada's death penalty scheme as a whole is facially constitutional, and NRS 200.033(9) is not arbitrary and capricious as applied in the instant case, we conclude that Greene's argument is without merit.

ECF No. 43-3 at 23–24.

### 3. Analysis

"[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). To do so, the aggravating circumstance "must apply only to a subclass of defendants convicted of murder" and "may not be unconstitutionally vague." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).

I find that it was not unreasonable for the Supreme Court of Nevada to conclude that the aggravator was not unconstitutional, given that it narrowed, at least somewhat, the range of murders to which the death penalty applied. Regarding Greene's first contention, this aggravator is not unconstitutionally vague because the terms "random" and "without apparent motive" do not necessarily need definition to be understandable. Regarding Greene's second contention, this aggravator was not unconstitutionally applied in this case. Greene argues that the prosecution argued that he went out on the night of the murder intending to experiment with the rifle to see how big a hole it would make when fired at something, but, according to Greene, this specific motive presented at the guilty phase of the trial is contradicted by the "without apparent motive" aggravator at the penalty phase of the trial. Greene conflates his motive to use the rifle versus his motive to kill a specific person. Here, the aggravator was constitutionally applied because the killings were not directed at a specific individual, as Greene would have shot any person he came upon that night. *See Geary v. State*, 930 P.2d 719, 727 (Nev. 1996) ("[I]n previous cases upholding the 'random and motiveless' aggravating circumstance, the defendant had no apparent history, prior relationship or personal involvement with the victim."). Finally, regarding Greene's other arguments—that the aggravator shifts the burden of proof, burdens his right to present a defense, burdens his right against self-incrimination, and punishes the absence of a motive—Greene fails to show that the Supreme Court of Nevada's rejection of those theories was contrary to, or an unreasonable application of, Supreme Court precedent. *See Moran v. McDaniel*, 80 F.3d 1261, 1273 (9th Cir. 1996) (declining to address the constitutionality of "random and without apparent motive"

aggravator). Moreover, the jury was specifically instructed that it was the state's burden to prove. Jury Instruction No. 13, ECF No. 41-2 at 14.

Because the Supreme Court of Nevada's determination constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts, Greene is not entitled to federal habeas relief for ground 7.

**G. Ground 8—Barker impeachment**

In ground 8, Greene alleges that his conviction and death sentence are invalid under federal constitutional guarantees of due process, equal protection, the right to present a defense, the right to rebut the prosecution's evidence, the right to confront witnesses, and a reliable sentence due to the trial court's refusal to allow impeachment of Barker. ECF No. 119 at 232, 236.

**1. Background information**

In an unrelated criminal matter, on August 24, 1995, Barker testified as a witness for the prosecution. *See* ECF No. 21-7. During cross-examination, the following colloquy took place between defense counsel and Barker:

> Q. But you people were all smoking marijuana in the room prior to the time they got in; isn't that true?
> A. I wasn't, a couple people weren't, a few were.
> Q. You don't smoke marijuana?
> A. No.
> Q. What is it that you do?
> A. Nothing.
> Q. You don't do anything?
> A. No.
> Q. You haven't done anything before you came to court today?
> A. Nope.
> Q. Are you willing right at this moment to go take a drug test?
> A. Yes, I am.
> Q. So you're not tweaked on same crank right this moment as we speak?
> . . .
> A. No.

*Id.* at 34–35. Later, the defense counsel "move[d] that [Barker] be required to immediately take a toxicology report" because he "ha[d] reason to believe she's under the influence as she testifies here." *Id.* at 50. Because Barker was willing to be drug tested, the court directed her to give a urine sample. *Id.* at 54.

About a month later, in Greene's trial, Greene's trial counsel requested that the trial court allow him to impeach Barker about the fact that she failed the drug test from that unrelated proceeding. ECF No. 38-5 at 18. Barker was brought in to testify outside the presence of the jury. ECF No. 38-15 at 20. Barker testified, *inter alia*, to the following: (1) she was informed that the results of her drug test from the unrelated proceeding were positive for methamphetamine and marijuana; (2) she thought the defense counsel in the other proceeding was asking whether she had taken any drugs that day, so she was answering truthfully when she answered in the negative; (3) she had not taken any drugs for "[m]aybe about a week" before testifying in the other proceeding and then it was only a small amount; and (4) at the time of her previous testimony, she may have been on painkillers and antibiotics for an ear infection. *Id.* at 21–27. Greene's trial counsel later stated that Barker's test results showed that she had "a huge amount" of methamphetamine in her system. ECF No. 39-3 at 4. The trial court then made a ruling on the impeachment issue:

> For purposes of this record, I have - - I have wrestled with this issue, trying to decide what to do. And as is my duty to disclose to you, [defense counsel], if I talked to someone else about it, I did, I talked to [another judge] about it this morning, asked her guidance on the issue. It appears to me - - and the example used for collateral impeachment was, did you lie on your tax return - - regardless of whether the answer is yes or no, it becomes collateral impeachment, and therefore not something that should be gone into.
>
> From what I heard on the witness stand from Ms. Barker yesterday, her testimony was, I interpreted the question to mean am I under the influence, but not did I consume drugs. I don't think, given that, that there's any element of intent, which is necessary to sustain any kind of a perjury finding.
>
> If I allow impeachment on what I consider to be a collateral issue - - and I consider this to be a collateral issue - - I would then also have to allow some kind of expert testimony concerning that drug test and its impact on her ability to be truthful and on her state of mind. That's leading to a further collateral issue.
>
> Therefore, I am not going to allow impeachment of Ms. Barker concerning her testimony given in the other proceeding. I do think it's a proper question for you to ask her if she has consumed drugs prior to her testimony today. I think that's clearly allowable. And, depending upon her answer, we'll take it from there. But I am not going to allow you to examine her regarding her testimony [from the unrelated proceeding].

*Id.* at 5–6.

During Greene's trial counsel's cross-examination of Barker, Barker testified, *inter alia*, to the following: (1) around September 1994, she was using "[s]peed and marijuana . . . once every couple months," (2) she did not use any drugs on September 22, 1994, (3) she had "been clean for a month and a half as of September 22nd, 1994," (3) she was not "under the influence" of drugs during her testimony at Greene's trial, and (4) as of the time of Greene's trial, she had not used any drugs for "[a]bout a month to a month and a half." ECF No. 39-6 at 29.

**2. Standard**

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). "[T]he Constitution [also] guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). A defendant's opportunity to be heard "would be an empty one if the State were permitted to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence." *Id.* This is because, "[i]n the absence of any valid state justification, exclusion of . . . exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.* at 690–91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

That being said, the United States Supreme Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Crane*, 476 U.S. at 690. In fact, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *United States v. Scheffer*, 523 U.S. 303, 308 (1998), and the Supreme Court has stated its approval of "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 320 (2006); *see also Nevada v. Jackson*, 569 U.S. 505, 509

(2013) ("Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence.").

#### 3. State court determination

In its order affirming Greene's judgment of conviction, the Supreme Court of Nevada held:

> Greene contends that the district court erred in prohibiting defense counsel from questioning witness Heather Barker concerning her testimony in a prior unrelated case. Greene asserts that Barker's "drug usage and lying under oath about drug usage are both highly relevant to the truthfulness of a witness." Greene argues that the evidence is admissible pursuant to NRS 50.085(3).
> [FN3] NRS 50.085(3) provides:
>
>> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime, may not be proved by extrinsic evidence. They may, however, if relevant to truthfulness, be inquired into . . . on cross-examination of a witness who testifies to an opinion of his character for truthfulness or untruthfulness, subject to the general limitations upon relevant evidence.
>
> In the prior unrelated case, Barker had been asked whether she had taken any drugs before giving testimony, to which she answered no. She subsequently consented to a urine test. The positive results of that test revealed some level of controlled substance in her system. The district court in the prior case sealed Barker's test results, and the type and amount of controlled substance in her system was never revealed. In the instant case, Greene wanted to impeach Barker with her testimony in that prior case. The district court ruled that defense counsel could question Barker about her drug use as it related to her current testimony, but not to her testimony in the prior case.
>
> The decision to admit evidence is within the sound discretion of the court. *Daly v. State*, 99 Nev. 564, 567, 665 P.2d 798, 801 (1983). In *Rembert v. State*, 104 Nev. 680, 683, 766 P.2d 890, 892 (1988), this court held that it was error to allow the State to attempt to impeach a defendant's credibility with extrinsic evidence relating to a collateral matter. *Accord Rowbottom v. State*, 105 Nev. 472, 485, 779 P.2d 934, 942 (1989). Further, "[e]ven where relevancy . . . may be found, fair trial demands that the evidence not be admitted in cases where, by virtue of its prejudicial nature, it is more likely to distract from the essential issue than bear up on it." *State v. Nystedt*, 79 Nev. 24, 27, 377 P.2d 929, 931 (1963) (quoting *Nester v. State*, 75 Nev. 41, 54, 534, 531 (1959)).
>
> We conclude that, under the circumstances of this case, the district court properly determined that any testimony regarding whether Heather Barker lied about using drugs or actually had drugs in her system at the prior unrelated trial was collateral. It was sufficient that defense counsel was permitted to question Barker concerning her drug use on the night of the murders and prior to testifying in the instant case. The district court did not abuse its discretion in prohibiting defense counsel from impeaching Barker regarding a collateral matter.

ECF No. 43-3 at 15–16.

**4. Analysis**

As the Supreme Court of Nevada reasonably determined, the circumstances surrounding Barker's testimony from the unrelated criminal matter were collateral and thus the trial court did not violate Greene's constitutional rights in limiting his trial counsel's impeachment of Barker regarding these collateral issues.

Barker's testimony in the unrelated criminal matter appears to be potentially perjurious. Barker testified that she did not smoke marijuana and did not do any other drugs; however, her drug test revealed that to be false. Although Barker had an explanation for why her drug test was positive when she had testified that she had not taken any drugs before coming into court, Barker did not offer an explanation for her definitive statement under oath that she did not, in general, use any drugs. The fact that Barker lied under oath in the unrelated criminal matter was certainly relevant to her credibility in that matter and appears to have been at least mildly relevant to her credibility in Greene's trial. However, for the reasons discussed below, the exclusion of this impeachment evidence falls short of rising to a due process violation. *See Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (explaining that the Supreme Court's prior holding in *Chambers* "is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.").

Barker testified about her general drug usage, her lack of drug usage on the day of the murders, and her lack of drug usage at Greene's trial. *See* ECF No. 39-6 at 29. As such, Greene's trial counsel was able to cross-examine Barker on the reliability of her testimony as it related to her drug usage to determine her ability to adequately perceive the events of the murder and to adequately relay those events to the jury. The fact that Barker may have lied under oath about her general drug usage in another case may have slightly affected her overall trustworthiness if Greene's trial counsel would have been allowed to inquire about it, but, given that the lie had nothing to do with the facts of the unrelated case, was cursory, and was made in a proceeding completely unconnected to Greene's case, it cannot be determined that the jury did not have sufficient information upon which

to assess Barker's credibility. *See Wood v. Alaska*, 957 F.2d 1544, 1550 (9th Cir. 1992) (explaining that "[a] trial court does not abuse its discretion [to determine whether evidence was relevant and its prejudicial effect] so long as the jury has 'sufficient information' upon which to assess the credibility of witnesses"). Accordingly, Greene fails to demonstrate that his trial counsel's preclusion from going down this road of cross-examination denied him his right to a fair opportunity to defend against the prosecution's accusations.

Because the Supreme Court of Nevada's determination constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts, Greene is not entitled to federal habeas relief for ground 8.

### H. Ground 9—gruesome photographs

In ground 9, Greene alleges that his convictions and death sentence are invalid under federal constitutional guarantees of due process, equal protection, trial before an impartial jury, and a reliable sentence due to the admission of gruesome photographs into evidence. ECF No. 119 at 237.

#### 1. Background information

During the trial, outside the presence of the jury, Greene's trial counsel made the following comments:

> At this point the State intends to have Dr. Jordan identify some photographs that depict [the victims] during the autopsy. . . .
>
> During the trial of Mr. Winfrey, when Dr. Jordan was testifying, on two separate occasions members of the jury became ill in looking at these photographs. And the reason I bring up that situation that occurred during the testimony of Dr. Jordan is it would be our position that the prejudicial impact of these photographs is well demonstrated by the reactions of, in that case, [jurors] that became sick during the testimony where these photographs were illustrated.
>
> I concede that the State has the right to put Dr. Jordan on and have him describe the injuries and the cause of death in this case, because it's an element of their case. However, I would object on behalf of Mr. Greene to these particular photographs being displayed to the jury. I think . . . Dr. Jordan . . . is a competent pathologist and speaks the English language quite well and can describe these wounds to the jury without the need to display these photographs to the jury.

ECF No. 39-11 at 24–25. The trial court overruled the objection, explaining:

> [A]t the trial of Mr. Winfrey the Court considered this same objection to these proposed exhibits, which are State's 24, 25, and 26. At that time, relying on *Robbins versus State*, 106 Nevada Advance Opinion 108, I overruled the objection to the photographs, relying on the *Robbins* language, which states, "On appeal we review allegations of error concerning the admissibility of autopsy photographs under an abuse of discretion standard," citing *Ybarra versus State*. "Absent an abuse of discretion by the trial court, the decision will not be overturned on appeal," citing *Turpin versus State*.
>
> I'm quoting from the *Robbins* decision. Quote, "In the instant case, following an objection by counsel, the trial court reviewed the photographs and held," quote, "'It appears to the court that based on the nature of the testimony the pictures are not unduly repetitious, and I think they are illustrative of the testimony, and for that reason I believe they are probative. They will assist the jury in understanding the doctor's testimony,'" end quote.
>
> The Supreme Court goes on to state, quote, "We have reviewed the challenged photographs, and although they are indeed graphic and troubling to human sensibility, they were not prejudicial. The photographs depicted exactly what Dr. Hollander described, and were undoubtedly helpful in assisting the jury to understand the nature and gravity of the wounds inflicted upon Brittany by Robbins. Trial court did not abuse its discretion. The photographs were properly admitted into evidence."
>
> The objection to State's 24, 25, and 26 is denied.

*Id.* at 27–28.

Dr. Robert Jordan later described exhibits 24, 25, and 26 as follows:

> This is a photograph [exhibit 24] of the decedent [Payton]. And what you see here is an area of darkening in the left eye, which is where the bullet went in. And on closer examination you can see the marked alteration of the normal contours of the head caused by the numerous underlying skull fractures.
>
> . . .
>
> This is a photograph [exhibit 25] of the decedent, Deborah Farris. The entrance gunshot wound is this small spot in the center of the neck below the chin[.] . . . The next photograph [exhibit 26] is a photograph of the back of Deborah Farris, showing the exit wound of that bullet as it came out on the -- on the back of her neck. You will notice that the exit wound is much larger than the entrance wound, as is characteristic of this type of projectile.

ECF No. 39-12 at 2, 8.

### 2. State court determination

In its order affirming Greene's judgment of conviction, the Supreme Court of Nevada held:

> Greene contends that the district court erred by admitting victim photographs because they were more prejudicial than probative. Greene asserts that because the same photographs had made a juror ill at Winfrey's trial, the district court had

> advance notice of the photographs' inflammatory nature and therefore, it should not have permitted their introduction.
>
> The admissibility of photographs is within the sound discretion of the trial court, whose decision will not be disturbed in the absence of a clear abuse of that discretion. *Paine v. State*, 110 Nev. 609, 617, 877 P.2d 1025, 1029 (1994), *cert. denied*, 115 S. Ct. 1405 (1995). It is within the court's discretion to admit photographs where the probative value outweighs any prejudicial effect the photographs might have on the jury. *Ybarra v. State*, 100 Nev. 167, 172, 679 P.2d 797, 800 (1984), *cert. denied*, 470 U.S. 1009 (1985).
>
> After reviewing the photographs, we conclude that the district court did not abuse its discretion by admitting them. The three photographs submitted to this court with the record on appeal are far from graphic. Two photographs are aerial views of the crime scene; the only photo of the two dead bodies shows them from a considerable distance. The third photograph is a picture of a young woman, presumably Deborah Farris, when she was alive. These photographs are more probative than prejudicial and there was no error.

ECF No. 43-3 at 16–17.

**3. De novo review**

The Supreme Court of Nevada described the photographs at issue as aerial photos and a photo of a young woman, not the photographs of the autopsies as described in the medical examiner's testimony. As such, the Supreme Court of Nevada's decision was based on a review of the wrong photographs, so this claim will be reviewed de novo. *See Panetti*, 551 U.S. at 948 ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires"); *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that . . . the state court's decision was based on an unreasonable determination of the facts, we evaluate the claim de novo.").

**4. Standard**

"[I]t [is] clear that the introduction of unduly prejudicial evidence could, in certain cases, violate the Due Process Clause." *Andrew v. White*, 604 U.S. 86, 96 (2025). However, "[a] habeas petitioner bears a heavy burden in showing a due process violation based on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005), *as amended on reh'g*, 421 F.3d 1154 (9th Cir. 2005). "[C]laims deal[ing] with admission of evidence" are "issue[s] of state law," *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), and "federal habeas corpus relief does not lie for

errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Therefore, the issue before this court is whether the admission of the evidence in question rendered the trial fundamentally unfair. *Estelle*, 502 U.S. at 67; *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) ("Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'" (emphasis in original)).

**5. Analysis**

The introduction of the photographs was undoubtedly detrimental to Greene, given that the photographs had the ability to be inflammatory. Indeed, following a review of the manually filed photographs, I agree that the photographs are graphic and distressing. *See* ECF No. 22 at 114–15 (manually filed with the court). However, it cannot be concluded that the admission of these photographs rendered Greene's trial fundamentally unfair in violation of due process. *Estelle*, 502 U.S. at 67; *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995); *Jammal*, 926 F.2d at 920. The photographs were admitted for the permissible purpose under Nevada law of assisting Dr. Jordan in explaining—and the jury in understanding—the cause and circumstances of the victims' deaths. *See Ybarra*, 679 P.2d at 800 (finding that "[t]he trial court did not abuse its discretion in admitting the photograph" that "would aid a witness, a pathologist, in explaining the cause and circumstances of death"). And contrary to Greene's argument that the photographs were not needed considering Dr. Jordan was able to verbally describe the victims' wounds, I find that the photographs were invaluable. Given that humans are highly visual beings, photographs enhance jurors' perceptions and convey a message more effectively than a mere verbal description.

Greene is not entitled to federal habeas relief for ground 9.

**I. Ground 10—antipsychotic medication**

In ground 10(a), Greene alleges that his conviction and death sentence are invalid under federal constitutional guarantees of due process, a fair trial, and a reliable sentence because the State administered high doses of antipsychotic medications to him prior to and throughout his trial and sentencing hearing. ECF No. 119 at 244. Relatedly, in ground 10(b), Greene alleges that his

conviction and death sentence are invalid under the federal constitutional guarantee of the effective assistance of counsel because his trial counsel was ineffective in handling the matter of the administration of the antipsychotic medication. *Id.*

This court previously noted that Greene had raised ground 10(a) during his first and second state habeas petitions. ECF No. 179 at 31. The Supreme Court of Nevada found that ground 10(a) was procedurally defaulted, but this court found that the bar used by the Supreme Court of Nevada—Nev. Rev. Stat. § 34.810—was inadequate. *Id.* Therefore, this court found that ground 10(a) was not barred by the procedural default doctrine. As such, I now review ground 10(a) de novo. *See Riley v. McDaniel*, 786 F.3d 719, 723 (9th Cir. 2015) ("Because no state court has adjudicated this claim on the merits, . . . the strictures of 28 U.S.C. § 2254(d) do not apply, and our review is *de novo*."). Turning to ground 10(b), this court previously found it to be procedurally defaulted and ordered that it would consider *Martinez* arguments when it rules upon the merits of the claim. ECF No. 179 at 32.

**1. Background information**

On February 2, 1995, while in jail awaiting trial, Greene informed jail personnel that he could not sleep well and had "been really depressed lately." ECF No. 21-2 at 29. In response, Greene was informed that sleeping pills would not be prescribed and was questioned about whether he had ever been treated for depression. *Id.* The following day, Greene informed jail personnel that he had been previously diagnosed with schizophrenia and manic depression and needed his medications. *Id.* at 30. Greene was prescribed antipsychotic medications. *Id.* at 60–61.

On September 5, 1995, on the first day of Greene's original trial, his trial counsel informed the state court that "Greene had been under some medication while in the detention center," but it had been "represented to [him] that [Greene] has not taken that medication for three weeks now and that [Greene] is not under the influence of any medication at this time." ECF No. 33-2 at 15. Greene's trial counsel then elaborated that Greene had been taking "Thorazine and Prolixin . . . [a]nd at [his] direction [Greene] refused the last attempt to give him further medication last week." *Id.* When asked by the trial court to confirm, Greene stated that he was "off it right now." *Id.* at 16.

Following the mistrial of Greene's original trial, on September 26, 1995, the second day of Greene's second trial, his trial counsel informed the state court that Greene had "not taken any medication for now an extended period of time that goes way before we started picking the jury the last time around." ECF No. 37-2 at 6–7. The trial court then asked Greene how he was feeling and if he was alright. *Id.* at 7. Greene responded, "I'm all right." *Id.*

During post-conviction proceedings, Greene's trial counsel testified that "[i]n looking at the medical records . . . for the first part of the trial that was mis-tried he was not taking his medication. After the mistrial he then started taking the medication again and, therefore, was on it for the second trial." ECF No. 44-15 at 23–24. However, Greene's trial counsel "found [Greene's] demeanor [to be] pretty consistent throughout the course of the trial proceedings." *Id.* at 23. Greene's trial counsel then testified that he did not inform the jury that Greene had been prescribed medications for his mental illness because he "thought that they might well think he was violent and needed medications to refrain from being violent." *Id.* at 25.

**2. Standard**

"The due process clause of the Fourteenth Amendment substantively protects a person's rights to be free from unjustified intrusions to the body, to refuse unwanted medical treatment and to receive sufficient information to exercise these rights intelligently." *Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002) (internal citation omitted). Indeed, "the Due Process Clause [only] permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Washington v. Harper*, 494 U.S. 210, 227 (1990). Once an inmate moves to terminate the administration of antipsychotic medication during his trial, the State becomes obligated to establish "that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of [the defendant's] own safety or the safety of others." *Riggins v. Nevada*, 504 U.S. 127, 135 (1992); *see also Sell v. United States*, 539 U.S. 166, 179 (2003) ("[T]he Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant

competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.").

### 3. Analysis

Because Greene requested that he be prescribed medication, he fails to demonstrate that the medication was unwanted or against his will. Greene argues that the administration of the medication should be deemed unwanted because it was done without a proper medical justification. However, insufficient justification does not make administration of the medication involuntary. Indeed, Greene requested the medication, took the medication without objection, declined to follow his trial counsel's direction to abstain from taking the medication, and shows no coercion by any party to take the medication. *See Benson*, 304 F.3d at 886 ("Benson has failed to establish that she was in any way incompetent or incapable of knowingly and intelligently taking the prescribed drugs or that she was subjected to any type of coercion by jail officials.").

Turning to Greene's ineffective-assistance-of-counsel contention, Greene's trial counsel made a record during both trials that Greene was not currently taking the medication. Although it appears from the record that Greene was actively taking the medication during the second trial, it does not appear that Greene's trial counsel was aware of this fact, and Greene failed to make a statement on the record at that time disputing his trial counsel's statement. Greene's trial counsel's performance was not deficient in this regard: he asked Greene to report to him which medications he was taking, he advised Greene to stop taking the medications during his trials, and he made a record of the situation during both trials.

Greene is not entitled to federal habeas relief for ground 10.

## J. Ground 11—voir dire

In ground 11, Greene alleges that he was deprived of his constitutional rights to effective assistance of counsel, due process, and a fair trial and sentencing hearing because the jury selection process at his trial fell short of constitutional standards.[10] ECF No. 119 at 281.

---

[10] This court previously dismissed grounds 11(a) and 11(b). ECF No. 179 at 33–34.

### 1. Standard for voir dire

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted). "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.* Likewise, "lack of adequate voir dire impairs the defendant's right to exercise peremptory challenges." *Id.*

### 2. Ground 11(c)—failing to challenge biased jurors for cause

In ground 11(c), Greene alleges that his trial counsel failed to challenge several biased jurors for cause. ECF No. 119 at 297. In its order on the motion to dismiss, this court found ground 11(c) was procedurally defaulted, but that Greene could possibly overcome the default via *Martinez*. ECF No. 179 at 34–35.

#### a. Background information

Prospective Juror Thomas indicated that she had answered in the affirmative on her questionnaire when asked if she "would be inclined to give a police officer's statements or testimonies more credence." ECF No. 37-4 at 24. Prospective Juror Thomas then explained her answer: she interpreted the question as asking whether she would accept a police officer's statement "as the truth, not more." *Id.* Prospective Juror Thomas then elaborated:

> We would not put more over someone else, just that they're in that position and we believe them. That doesn't make any sense. I wouldn't believe more than someone else, just that I would have a tendency to believe a police officer, knowing of course that they can make mistakes. So it's not blatant, it would not be a blind belief. But for the most part you believe police officers, for the most part.

*Id.* When pressed further by defense counsel, Prospective Juror Thomas stated that she "guess[ed]" that she would "probably be inclined to take [a police officer's] word . . . over that of the other individual." *Id.* at 26. Defense counsel passed Prospective Juror Thomas for cause. *Id.* at 30.

Prospective Juror Hagen stated that she "would give more weight to the testimony of a police officer" because she had "grown up in a law enforcement environment, and [she] ha[d] a great deal of respect for them." ECF No. 37-9 at 6. Prospective Juror Hagen also explained that she socialized with members of the Metropolitan Police Department, that her husband was a police officer, her brother was with the State Department, and her father was with the FBI. *Id.* at 6–7. Defense counsel passed Prospective Juror Hagen for cause. *Id.* at 8.

Prospective Juror Trelease stated that he would be inclined to "give a police officer's testimony more credence" because "they're trained to observe the facts and understand a situation better." ECF No. 37-5 at 28. Prospective Juror Trelease then elaborated: "I realize I wouldn't take [a police officer's statement] purely because he is a police officer[,] . . . [t]here could be situations where he's in error or lying." *Id.* When pressed further by defense counsel, Prospective Juror Trelease stated that he "would tend to" give more credence to a police officer's statement just because he is a police officer. *Id.* at 29. Defense counsel passed Prospective Juror Trelease for cause. ECF No. 37-6 at 2.

Defense counsel challenged the following jurors for cause because of their knowledge of Winfrey's conviction: Prospective Jurors Harvey, Ford, Herdt, Stoop, Cote, Wenzlaff, and Palmes. ECF No. 36-10 at 2–3; ECF No. 37-2 at 5. The trial court held the issue over for the following day to allow defense counsel to submit supporting case law. ECF Nos. 36-10 at 5. Because defense counsel was unable to find any supportive caselaw, the trial court denied the motions to strike these jurors for cause. ECF No. 37-2 at 4. The trial court did note that defense counsel provided a case supporting the opposite opinion, though, and complimented defense counsel for following the canons of ethics. *Id.*

**b. Analysis**

First, Greene fails to demonstrate that his trial counsel acted deficiently in not moving to strike Prospective Jurors Thomas, Hagen, and Trelease for cause. Although Prospective Jurors Thomas, Hagen, and Trelease expressed general sentiments about tending to give police officer's testimonies more credence, none of these jurors expressed absolute and unconditional acceptance

of police officers' testimonies merely due to their profession. Further, the only eyewitness to the crimes committed by Winfrey and Greene was Barker—a layperson. Greene fails to demonstrate how these three jurors' general tendencies to trust police officers made them biased jurors considering that the main evidence of Greene's guilt did not come from a police officer. Second, Greene fails to demonstrate that his trial counsel acted deficiently regarding Prospective Jurors Harvey, Ford, Herdt, Stoop, Cote, Wenzlaff, and Palmes. Indeed, Greene's trial counsel moved to strike these jurors for cause because of their knowledge of Winfrey's conviction and asked for time to research caselaw to support his motion. As such, based on the record, Greene's ineffective assistance of trial counsel claim is not substantial because Greene fails to demonstrate ineffectiveness under *Strickland*. Because Greene fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 11(c), it is dismissed.

**3. Ground 11(d)—failing to ensure an adequate voir dire process**

In ground 11(d), Greene alleges that his trial counsel failed to ensure the voir dire process resulted in a constitutionally adequate jury panel. ECF No. 119 at 299. Specifically, Greene contends that his trial counsel should have (1) objected to the trial court's voir dire process, which lacked uniformity and resulted in the jurors being questioned as a group, and (2) adequately explained the Nevada capital murder statute and the process of weighing mitigating and aggravating circumstances. *Id.* Greene points to his trial counsel's following misstatement regarding the imposition of a death sentence to Prospective Juror Henderson to support his second contention: "The State will present to you certain factors called aggravating circumstances," and "[t]he defendant is given an opportunity to present to you mitigating circumstances, good things, background, the age of the defendant, things like that," explaining that the jury is then "given the opportunity to decide what an appropriate punishment is." ECF No. 37-3 at 11. Greene's trial counsel explained that all he was needing to know at that time was if the prospective juror "could . . . consider the death penalty as a punishment." *Id.*

In its order on the respondents' motion to dismiss, this court found ground 11(d) was procedurally defaulted, but that Greene could possibly overcome the default via *Martinez*. ECF No. 179 at 35. However, because Greene's ineffective assistance of trial counsel claim is not substantial under *Strickland*, Greene fails to demonstrate requisite prejudice necessary to overcome the procedural default. Indeed, Greene fails to demonstrate how the trial court's voir dire procedures or his trial counsel's condensed explanation of the imposition of a death sentence under Nevada law amounted to the entire voir dire process being inadequate. These alleged voir dire irregularities by the trial court and lack of a thorough explanation by Greene's trial counsel appear negligible and fall far from a finding that the voir dire process was deficient. Moreover, the purpose of voir dire is to identify unqualified jurors and Greene fails to make the connection between these supposed errors and unqualified jurors being seated on the jury. So Ground 11(d) is dismissed.

#### 4. Ground 11(e)—failing to make appropriate *Batson* challenges

In ground 11(e), Greene alleges that his trial counsel failed to make appropriate *Batson* challenges. ECF No. 119 at 300. In its order on the State's motion to dismiss, this court found ground 11(e) was procedurally defaulted, but that Greene could possibly overcome the default via *Martinez*. ECF No. 179 at 36.

##### a. Background information

During the voir dire process, Greene's trial counsel, the prosecution, and the trial judge were discussing the best process for dealing with *Batson* challenges. ECF No. 38-5 at 15. Greene's trial counsel explained the following:

> And so the Court is aware, when [the prosecutor] first brought this issue up it was with respect to Juror 188, Mrs. Henderson. And I don't know if he's going to challenge Mrs. - - or preempt Mrs. Henderson or not. Mrs. Henderson, he did challenge for cause based on her answers, that she doesn't feel she could judge whether someone else would live or die. As an officer of the court, if [the prosecutor] exercised a preempt against . . . Ms. Henderson, I believe he could state a race-neutral reason for exercising that challenge, and I would not, with respect to that juror, raise a *Batson* objection. So I don't think we'd have to approach the bench on that one.

*Id.* The trial court then stated, "if you want my advisory ruling, I think he could clearly state a race-neutral reason for it, too." *Id.* at 16. The prosecution later used a preemptory challenge to strike Prospective Juror Henderson. ECF No. 38-6 at 4.

Later, Prospective Juror Bingham stated that he had been arrested for domestic violence. ECF No. 38-5 at 26. The prosecution moved to strike Prospective Juror Bingham for cause given that the prosecution felt that he had purposefully lied on his jury questionnaire about his arrest. *Id.* at 28. The trial court denied the request, finding that Prospective Juror Bingham's "explanation seem[ed] plausible." *Id.* at 27. The prosecutor then asked Greene's trial counsel if he "would agree that [Prospective Juror Bingham] would fall into the same category as Mrs. Henderson." *Id.* at 28. Greene's trial counsel stated, "[w]ith respect to a *Batson* challenge, I would agree that that would appear to be a race-neutral reason for the State" to preempt Prospective Juror Bingham. *Id.* The prosecution then used a preemptory challenge to strike Prospective Juror Bingham. *Id.* at 30.

**b. Analysis**

It appears that Greene's trial counsel could have raised a *Batson* issue regarding the prosecution's use of peremptory challenges on Prospective Jurors Henderson and Bingham. *See J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127, 129 (1994) (explaining that the use of a peremptory challenge to remove a prospective juror because of race violates the federal constitution). However, Greene fails to demonstrate that raising such requests would have been fruitful. Under *Batson v. Kentucky*, consideration of a defendant's challenge to a peremptory strike involves a three-step analysis. 476 U.S. 79 (1986). As is relevant here, the first two steps are outlined as follows: "the defendant [must] ma[k]e a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecution to present a race-neutral explanation for striking the juror in question." *Rice v. Collins*, 546 U.S. 333, 338 (2006). Because the prosecution would have been able to present race-neutral explanations for striking Prospective Jurors Henderson and Bingham—Prospective Juror Henderson not believing she could judge whether someone else should live or die and Prospective Juror Bingham being previously arrested for domestic violence and omitting such information from his jury questionnaire—it would have

been futile for Greene's trial counsel to have raised a *Batson* challenge. As such, based on the record, Greene's ineffective assistance of trial counsel claim is not substantial because Greene fails to demonstrate ineffectiveness under *Strickland*. Because Greene fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 11(e), it is dismissed.

**5. Ground 11(f)—failing to move for a change of venue**

In ground 11(f), Greene alleges that his trial counsel failed to move for a change of venue because extensive pretrial publicity reduced the likelihood of Mr. Greene's receiving a fair trial. ECF No. 119 at 301. In its order on the State's motion to dismiss, this court found ground 11(e) was procedurally defaulted, but that Greene could possibly overcome the default via *Martinez*. ECF No. 179 at 36.

Although there was certainly pretrial publicity of Greene's case, Greene fails to demonstrate that such pretrial publicity resulted in widespread bias throughout the community, especially in light of the fact that the prospective jurors were questioned about any pretrial publicity they had come across. *See McCleskey v. Kemp*, 481 U.S. 279, 310 n.30 (1987) ("Widespread bias in the community can make a change of venue constitutionally required."). Further, Greene's trial counsel moved to strike several jurors for cause based on their knowledge of the case from pretrial publicity, but the trial court denied the requests. *See* ECF No. 38-5 at 6–7. Because the trial court refused to excuse jurors for cause based on their knowledge of pretrial publicity, Greene fails to demonstrate that a motion for change of venue on the same basis would have been fruitful. *See Bolin v. Davis*, 13 F.4th 797, 808 (9th Cir. 2021) ("Having observed the voir dire, the trial court denied defense counsel's for-cause challenges to jurors that were based solely on jurors having acknowledged seeing the *America's Most Wanted* episode. As the district court reasoned, it is unlikely that a trial judge who may have just denied a challenge to a juror for cause based on prejudice stemming from publicity will grant a motion to change venue a short time later." (internal quotation marks omitted).); *see also United States v. Palomba*, 31 F.3d 1456, 1461 (9th Cir. 1994) ("Palomba produced no evidence or argument suggesting that his counsel's failure to defeat venue . . . had any bearing on the fairness of his trial or was otherwise prejudicial or outcome-

determinative."). As such, Greene's ineffective assistance of trial counsel claim is not substantial because Greene fails to demonstrate that his trial counsel was ineffective under *Strickland*. Because Greene fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 11(f), it is dismissed.

**K. Ground 12—ineffective assistance of direct appeal counsel**

In ground 12, Greene alleges that his conviction and sentence are invalid under federal constitutional guarantees of due process of law, equal protection of the laws, effective assistance of counsel and a reliable sentence because he was not afforded effective assistance of counsel on appeal. ECF No. 119 at 303. In its Order on the State's motion to dismiss, this court found that ground 12 was not procedurally defaulted with respect to Greene's claims that his appellate counsel was ineffective for not asserting the claims in grounds 5; 6(a) to the extent that Greene claims the prosecution committed misconduct in its closing arguments in the penalty phase of his trial; 7(a); and 7(c). ECF No. 179 at 38. The remainder of ground 12 was dismissed. *Id.* at 43.

**1. Standard of review**

The *Strickland* standard, articulated *supra*, is also utilized to review appellate counsel's actions. To obtain relief, a petitioner must show "that [appellate] counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). The petitioner must then show "that, but for his [appellate] counsel's unreasonable failure to file a merits brief, [petitioner] would have prevailed on his appeal." *Id.*

**2. Appellate counsel's failure to raise ground 5**

Greene alleges that his appellate counsel acted ineffectively in failing to adequately challenge Nevada's first-degree murder law. ECF No. 119 at 190, 304.

In affirming the denial of Greene's state post-conviction petition, the Supreme Court of Nevada held:

> Greene contends that [his appellate counsel] was ineffective for failing to challenge on direct appeal various murder instructions. We disagree.

> We reviewed the homicide instructions in Greene's direct appeal and concluded that "the jury instructions regarding homicide comport with the law." [FN 37: *Greene*, 113 Nev. at 168, 931 P.2d at 61.] Greene nevertheless argues that his appellate counsel was ineffective in challenging the *Kazalyn* instruction [FN 38: *see Garner v. State*, 116 Nev. 770, 787 n.6, 6 P.3d 1013, 1024 n.6 (2000), *overruled in part on other grounds by*, *Sharma v State*, 118 Nev. 648, 56 P.3d 868 (2002).] given in his case because this court overruled its decision in Greene's direct appeal when it published *Byford v. State* [FN 39: 116 Nev. at 235, 994 P.2d at 713.]. Because *Byford* was not published until two years after this court affirmed Greene's conviction, his appellate counsel could not be ineffective for failing to challenge the *Kazalyn* instruction pursuant to *Byford*. Moreover, this court has stated that giving the *Kazalyn* instruction was not constitutional error and that *Byford* has no retroactive effect. [FN 40: *Garner*, 116 Nev. at 787–89, 6 P.3d at 1024–25.] We conclude that the district court properly denied him relief on this claim.

ECF No. 50-7 at 17.

Because Greene's appellate counsel challenged Nevada's first-degree murder law on direct appeal, Greene fails to demonstrate that his appellate counsel acted deficiently in this regard. However, even if Greene's appellate counsel acted deficiently for not challenging Nevada's first-degree murder law in the way Greene believes should have been done, Greene fails to demonstrate prejudice (1) for the reasons discussed in ground 5, *supra*, and (2) because the Supreme Court of Nevada, acting in its review of the denial of Greene's state post-conviction petition, is in the exclusive position as the final arbiter of Nevada law to determine whether it would have granted relief on direct appeal—given that the underlying claim regarding Nevada's first-degree murder law is an issue of state law and the Supreme Court of Nevada is the final arbiter of Nevada law—and here, it determined it would have not have granted relief had Greene's appellate counsel performed differently.

Therefore, the Supreme Court of Nevada's determination that Greene failed to show ineffectiveness on the part of his appellate counsel constituted an objectively reasonable application of *Strickland*. Greene is not entitled to federal habeas relief for this portion of ground 12.

**3. Appellate counsel's failure to raise portion of ground 6(a)**

Greene alleges that his appellate counsel failed to challenge the prosecution's misconduct in its closing arguments at the penalty phase of his trial. ECF No. 119 at 213, 304.

**a. Background information**

During closing arguments at the penalty phase of the trial, the prosecution argued that the murders were "brutal[] and so very casual." ECF No. 40-13 at 17. It then went on to describe the murders as follows:

> This was a thrill kill. This was a killing for excitement, for fun, by this defendant. There was absolutely no reason to kill Christopher Payton, and unless you feel that the defendant killed Deborah Farris to prevent her from talking to the police about what he had done, there was no reason to kill Deborah Farris. The evidence strongly suggests that the defendant killed Deborah Farris and Chris Payton for the fun of it, and to see just how big a hole that mini-14 could make in someone, not something, but someone. The defendant laughed about how the victims looked, how Mr. Payton looked with his eye being shot out, and how Deborah Farris looked with all the blood gushing from the area of her neck.

*Id.* at 21. The prosecution then reiterated that Greene "commit[ed] the ultimate evil, not once, but two times." *Id.* at 25. Next, the prosecution argued,

> This defendant was doing exactly what he wanted to do on September 23, 1994, as he has always done in the past. This defendant does what he wants, and on September 23rd, 1994, he wanted to kill two people, and he succeeded. This has nothing to do with being molested as a child, it has nothing to do with having a separation or a divorce in your family, it certainly has nothing to do with being an adopted child.

*Id.* at 26. The prosecution concluded its argument as follows:

> Another reason why the death penalty is appropriate, is deterrence. Deterrence is achieved through the severity of punishment. It is important for the image of the criminal justice system, for those who view how it works, that they understand that lines are drawn that you just don't step over. And, ladies and gentlemen, on September the 23rd, 1994, this defendant stepped over the line, way over the line. A sentence of death will send out a good message. . . . A sentence of death might deter the future Travers Greenes of this world.

*Id.* at 28.

**b. State court determination**

In affirming the denial of Greene's state post-conviction petition, the Supreme Court of Nevada held:

> Greene also contends that his appellate counsel was ineffective for failing to challenge on direct appeal . . . prosecutorial misconduct. Having already concluded that these issues did not support Greene's claims that his trial counsel were

> ineffective, we conclude for the same reason that he failed to demonstrate that his appellate counsel was ineffective.

ECF No. 50-7 at 18 n.41. When rejecting the claims of ineffective assistance of trial counsel for failing to object to instances of alleged prosecutorial misconduct during the penalty hearing, the Supreme Court of Nevada stated:

> We have carefully reviewed the various remarks by the prosecutor that Greene challenges on the grounds that they improperly asked the jurors to place themselves in the victim's shoes; improperly urged the jurors that it was their duty to impose a death sentence; improperly argued that the death penalty was a deterrent; improperly inserted the prosecutor's personal opinion; improperly sought to inflame the jurors; and improperly argued that the death penalty was an act of self-defense by society. We conclude that the district court correctly determined Greene's trial counsel were not ineffective for failing to object to these remarks.

*Id.* at 14.

**c. Analysis**

Although Greene's appellate counsel could have raised these issues on direct appeal, Greene fails to demonstrate prejudice (1) because the Supreme Court of Nevada, acting in its review of the denial of Greene's state post-conviction petition, is in the exclusive position as the final arbiter of Nevada law to determine whether it would have granted relief on direct appeal, and here, it determined it would have not have granted relief and (2) Greene fails to demonstrate that these alleged improper comments were so problematic as to meet the standard for granting relief on direct appeal. Specifically, regarding the latter demonstration, Greene alleges that the prosecutor improperly gave his personal opinion, appealed to the passions and prejudices of the jury, and asked the jury to send a message to the community. ECF No. 119 at 213–14.

First, although the prosecutor's arguments that the murders were brutal and were committed for fun may come close to crossing the line into personal opinions, these arguments were supported by the evidence at the trial. *See Drayden*, 232 F.3d at 713 (concluding that the prosecutor's statements did not infect the trial with unfairness because "the prosecutor's statements were supported by the evidence and reasonable inferences that could be drawn from the evidence").

Second, Greene fails to explain how the prosecutor appealed to the passions of the jury by arguing that Greene's molestation, his parents' divorce, and his adoption had nothing to do with the murders. *See Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (denying habeas relief because the petitioner's "conclusory allegations did not meet the specificity requirement"). And third, regarding the prosecutor's argument about imposing a sentence of death as a deterrent to others, this remark likely crossed the line into being improper. *See United States v. Barragan*, 871 F.3d 689, 707 (9th Cir. 2017) ("'[P]rosecutors may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking.'"). However, this comment was limited in nature and does not rise to the level of having a probable effect on the jury's sentence of death. *See Sassounian v. Roe*, 230 F.3d 1097, 1107 (9th Cir. 2000) (determining, in part, that the petitioner was not denied a fair trial due to prosecutorial misconduct because "the misconduct was isolated").

Accordingly, the Supreme Court of Nevada's determination that Greene failed to show ineffectiveness on the part of his appellate counsel constituted an objectively reasonable application of *Strickland*. Greene is not entitled to federal habeas relief for this portion of ground 12.

**4. Appellate counsel's failure to raise grounds 7(a) and 7(c)**

Greene alleges that his appellate counsel failed to challenge the "at random and without an apparent motive" aggravator. ECF No. 119 at 221, 304. In affirming the denial of Greene's state post-conviction petition, the Supreme Court of Nevada held as follows: "Having already concluded that these issues did not support Greene's claims that his trial counsel were ineffective, we conclude for the same reason that he failed to demonstrate that his appellate counsel was ineffective." ECF No. 50-7 at 18 n.41. When rejecting the claim of ineffective assistance of trial counsel for failing to "challenge the constitutionality of the two aggravators found in his case," the Supreme Court of Nevada stated: "The constitutionality of NRS 200.033(9) and NRS 200.033(12) were reviewed in Greene's direct appeal. This court found these provisions were constitutionally applied in Greene's case." *Id.* at 15 n.30.

Because Greene's appellate counsel challenged the "at random and without apparent motive" aggravating factor on direct appeal, Greene fails to demonstrate that his appellate counsel was ineffective in this regard. However, even if Greene's appellate counsel was ineffective for not challenging this issue in the way he believes should have been done, Greene fails to demonstrate prejudice (1) for the reasons discussed in ground 7, *supra*, and (2) because the Supreme Court of Nevada, acting in its review of the denial of Greene's state post-conviction petition, is in the exclusive position to determine whether it would have granted relief on direct appeal—given that the underlying claim regarding Nevada's penalty phase aggravators concerns, at least in part, an issue of state law and the Supreme Court of Nevada is the final arbiter of Nevada law—and here, it determined it would have not have granted relief had Greene's appellate counsel performed differently. Therefore, the Supreme Court of Nevada's determination that Greene failed to show ineffectiveness on the part of his appellate counsel constituted an objectively reasonable application of *Strickland*. Greene is not entitled to federal habeas relief for this portion of ground 12.

**L. Ground 13—cumulative error**

In ground 13, Greene alleges that his conviction and death sentence are invalid under federal constitutional guarantees of due process, equal protection, the effective assistance of counsel, a fair tribunal, an impartial jury, and a reliable sentence due to the cumulative errors in the admission of evidence and instructions, gross misconduct by state officials and witnesses, and the systematic deprivation of his right to the effective assistance of counsel. ECF No. 119 at 307.

Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court must assess whether the aggregated errors "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (quoting *Donnelly*, 416 U.S. at 643).

In its order affirming Greene's judgment of conviction, the Supreme Court of Nevada held:

> Relying upon *Sipsas v. State*, 102 Nev. 119, 716 P.2d 231 (1986), Greene asserts that cumulative error requires reversal and remand for a new trial.
>
> Where the accumulation of error is more serious than an isolated breach, it may result in the denial of the constitutional right to a fair trial. *Id.* at 125, 716 P.2d at 234. There was no accumulated error resulting in the denial of a fair trial in the proceedings below. Greene received a fair and unprejudiced trial by his peers comporting with constitutional requirements. Thus, Greene's contention lacks merit.

ECF No. 43-3 at 25–26. I find this determination to be a reasonable application of clearly established federal law. For the reasons discussed in this Order, *supra*, I find that the cumulation of any errors occurring during the guilt-phase of the trial—including the claims of prosecutorial misconduct, improper evidentiary decisions, invalid jury instructions, and overbroad aggravating circumstance—did not amount to Greene's trial being unfair, prejudicial, or a denial of due process.

**M. Ground 15—elected judges**

In ground 15, Greene alleges that his conviction and sentence violate the federal constitutional guarantees of due process of law, equal protection of the laws, a reliable sentence, and international law because his capital trial, sentencing, review on direct appeal, and review on post-conviction were conducted before state judicial officers whose tenure in office was dependent on popular election. ECF No. 119 at 312.

Greene did not assert such a claim on direct appeal. *See* ECF No. 42-4; ECF No. 42-5. Greene asserted a similar claim on the appeal in his first state habeas action, and the Supreme Court of Nevada ruled:

> Greene contends that his trial proceedings and this court's review on direct appeal violated his constitutional rights because they were conducted by judicial officers whose tenure in office was dependent upon popular election. Because this claim was not raised on direct appeal, it is procedurally barred. [FN 43: *See* NRS 34.810(1)(b)(1).] Greene has failed to overcome this bar. Thus, we conclude that this claim was properly denied by the district court. [FN 44: *See* NRS 34.810(3).]

ECF No. 50-7 at 19. In its order on the respondents' motion to dismiss, this court found that Nevada Revised Statute § 34.810 was inadequate to support application of the procedural default doctrine, and that this claim was not barred by procedural default. ECF No. 179 at 40. Because the Supreme

Court of Nevada only ruled that the claim was procedurally barred, and never addressed the merits when Greene raised this claim in his first state habeas action, I review this ground de novo.

The Due Process Clause of the United States Constitution guarantees a criminal defendant the right to a fair and impartial judge. *See In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."); *Mistretta v. United States*, 488 U.S. 361, 407 (1989) ("The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship."); *Peters v. Kiff*, 407 U.S. 493, 502 (1972) ("[E]ven if there is no showing of actual bias in the tribunal, this Court has held that due process is denied by circumstances that create the likelihood or the appearance of bias."). This court's objective inquiry regarding Greene's impartial judge claim "ask[s] whether the average judge in her position was likely to be neutral or whether there existed an unconstitutional potential for bias." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009). "Every procedure which would offer a possible temptation to the average . . . judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the [accused] due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

To be sure, Nevada judges and justices are elected officials. *See* Nev. Const. art. 6, Sec. 3, 5. Greene argues that this election process means that Nevada judges face political pressure in their decision-making because they face the possibility of removal if they make a controversial or unpopular decision. ECF No. 119 at 312. Although this may be inherently true, Greene fails to demonstrate that this political pressure amounts to the potential for bias. Indeed, I presume that judges serve with honesty and integrity, *see Withrow v. Larkin*, 421 U.S. 35, 47 (1975), take an oath to support, protect, and defend the Constitution and Government of the United States and the State of Nevada, *see* Nev. Rev. Stat. § 282.020, and Greene fails to overcome this presumption with mere allegations that Nevada judges act with a dearth of laxity towards defendants simply to achieve reelection.

Greene is not entitled to federal habeas relief on ground 15.

### N. Ground 16—lethal injection

In ground 16, Greene alleges that his death sentence is invalid under the federal constitutional guarantees of due process, equal protection, and a reliable sentence because execution by lethal injection violates the constitutional prohibition against cruel and unusual punishments. ECF No. 119 at 317. Specifically, Greene argues in ground 16(a) that lethal injection is unconstitutional in all circumstances. *Id.* at 317–29. And in ground 16(b), Greene argues that lethal injection in Nevada is unconstitutional.[11] *Id.* at 330–42.

#### 1. Nevada law on execution

Nevada law provides for only one method of execution—lethal injection. Nev. Rev. Stat. § 176.355. Nevada law assigns the Nevada Department of Corrections' (NDOC) Director the responsibility of selecting the drug or combination of drugs to be used for the execution *after* consulting with the Chief Medical Officer of Nevada. *Id.* The NDOC's Director may also consult with any other qualified medical and pharmaceutical professionals to ensure the selected lethal drug or combination of drugs and dosages are sufficient to cause death. NDOC Execution Manual 103.01. Upon determination of the method of lethal injection, the NDOC Director and Deputy Director publish an execution protocol detailing the method of execution, dosages, concentrations, and preparation instructions, among other subjects. Absent a stay of execution, the Director shall execute a sentence of death within the week the judgment is to be executed. Nev. Rev. Stat. § 176.495.

#### 2. Analysis

Turning to ground 16(a) first, Greene's general challenge of the constitutionality of lethal injection fails. In *Baze v. Rees*, the United States Supreme Court, on an appeal from a judgment in a civil rights action, ruled Kentucky's lethal injection protocol to be constitutional. 553 U.S. 35 (2008). The *Baze* holding forecloses any argument that lethal injection, no matter how administered,

[11] Regarding ground 16(b), in its order on respondents' motion to dismiss, this court recognized that respondents raised serious questions about the procedural viability of the claim, but, because it was unclear whether the State had yet established the protocol by which Greene's execution would be conducted, the court left these questions, and any other issues concerning the claim, to be determined during merits review. ECF No. 179 at 41.

is necessarily unconstitutional and demonstrates that lethal injection can be administered in a manner that does not constitute cruel and unusual punishment in violation of the Eighth Amendment. I, therefore, reject Greene's general challenge to execution by lethal injection.

Turning to Greene's as-applied challenge, ground 16(b), I conclude that such a challenge to Nevada's execution protocol is not cognizable in this federal habeas corpus action. In *Nelson v. Campbell*, a state prisoner sentenced to death filed a civil rights action alleging that the state's proposed use of a certain procedure, not mandated by state law, to access his veins during a lethal injection would constitute cruel and unusual punishment. 541 U.S. 637 (2004). The Supreme Court reversed the lower courts' conclusion that the claim sounded in habeas corpus and could not be brought as a 42 U.S.C. § 1983 action. *Id.* at 645. The Court stated that the prisoner's suit challenging "a particular means of effectuating a sentence of death does not directly call into question the 'fact' or 'validity' of the sentence itself—by simply altering its method of execution, the State can go forward with the sentence." *Id.* at 644. In *Hill v. McDonough*, the Supreme Court reaffirmed the principles articulated in *Nelson*, ruling that an as-applied challenge to lethal injection was properly brought by means of a § 1983 action. 547 U.S. 573, 580–83 (2006). Both *Nelson* and *Hill* suggest that a § 1983 claim is the more appropriate vehicle for an as-applied challenge to a method of execution. *See also Beardslee v. Woodford*, 395 F.3d 1064, 1068–69 (9th Cir. 2005) (holding that a condemned inmate's claim that California's lethal injection protocol violates the Eighth and First Amendments "is more properly considered as a 'conditions of confinement' challenge, which is cognizable under § 1983, than as a challenge that would implicate the legality of his sentence and thus be appropriate for federal habeas review"). Moreover, it is possible—and, given the amount of time that passes before a death sentence is carried out, it may be likely—that execution protocols will change between the time when a death sentence is imposed and the time when the death sentence is carried out. Therefore, the constitutionality of an execution protocol may change after the judgment is entered imposing the death sentence. Habeas corpus law and procedure have not developed, and are not suited, for the adjudication of such issues. Therefore, I conclude that an as-

applied challenge to a method of execution is not a challenge to the constitutionality of the petitioner's custody or sentence.

Greene is not entitled to federal habeas relief for ground 16.

## IV. Certificate of Appealability

This is a final order adverse to Greene. Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). I have sua sponte evaluated the claims within the amended petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Applying these standards, to the extent it is necessary given the granting of relief on grounds 1(a), 1(b), and 1(d), I find that a certificate of appealability is unwarranted for Greene's remaining grounds.

## V. Motion to Conduct Discovery

Greene previously filed a motion for leave to conduct discovery. ECF No. 164. This court denied the motion with leave to file a new motion for leave to conduct discovery. ECF No. 179 at 41–42. This court noted that "[f]urther consideration of the claims on which Greene wishes to conduct discovery is deferred until after Respondents file an answer and Greene files a reply." *Id.* at 41. Greene now renews his motion for leave to conduct discovery. ECF No. 200. Respondents opposed the motion, and Greene replied. ECF No. 211; ECF No. 218.

### A. Governing law

Discovery in habeas matters is governed by Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, which states: "A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that,

the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." The Supreme Court has construed Rule 6, holding that if through "specific allegations before the court," the petitioner can "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). This inquiry is informed by the essential elements of the claims for which petitioner seeks discovery. *Id.* at 904. Thus, the purpose of discovery in a habeas proceeding is not to develop new claims, but, rather, to develop factual support for specific allegations contained in existing claims. *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) ("Habeas is an important safeguard whose goal is to correct real and obvious wrongs. It was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence.'").

**B. Discussion**

Greene seeks discovery of the following: (1) discovery showing trial counsel was ineffective in failing to investigate and present mental health evidence, and (2) discovery showing the state failed to disclose material exculpatory and impeachment evidence. ECF No. 200. Specifically, Greene seeks leave (1) to depose the probation officer who supervised him closest in time to the instant offense, Mr. Douglas Kinsey; (2) discovery of the actual tape of his voluntary police statement; (3) discovery of the clothes he was wearing when he was arrested; (4) discovery of any drug tests performed on him within seventy-two hours of his arrest; (5) discovery of records related to the medication he received before and during his trial; (6) discovery of any rules or protocols regarding the provision of mental health care and the administration of his medication; (7) discovery of the results of any psychological testing that may have been performed on him; (8) discovery of any notes or other documents related to any psychological testing or evaluation performed on him; (9) discovery of any psychological reports; (10) discovery of records from any college classes he took during his time in Las Vegas, Nevada; (11) to depose David Roger, the District Attorney of Clark County at the time of Greene's second state post-conviction proceeding

and Deputy District Attorney in charge of prosecuting Greene's case at trial, to determine the nature and extent of his dealings with Fisher; and (12) to serve subpoenas on the Clark County District Attorney and Las Vegas Metropolitan Police Department to obtain all records related to Fisher. *Id.* I will discuss each of these discovery requests in turn.

First, regarding Greene's desire to depose Greene's probation officer, he argues that this deposition would support his allegation that when he first moved to Las Vegas, he attempted to comply with his parole conditions and turn his life around, but that due to a lack of adequate supervision, he fell prey to a manipulative drug dealer who facilitated a serious drug addiction. *Id.* at 8–9. Similarly, regarding Greene's discovery request of his college records, he argues that this information would show that he tried to turn his life around, but due to the negative influence of Fisher and others, he eventually turned to drugs and crime. *Id.* at 11. Although I agree with Greene that these facts are relevant to his trial counsel's alleged failure to investigate and present mitigating evidence, I find that there is no need for these requests at this time because, as was discussed in grounds 1(a), 1(b), and 1(d), Greene has already shown that he is entitled to relief absent these facts.

Second, regarding discovery of the actual tape of his voluntary police statement, his clothing at the time of his arrest, and any drug tests performed on him within seventy-two hours of his arrest, Greene argues that this discovery would determine his level of intoxication. *Id.* at 9–10. Greene's voluntary statement was tape-recorded on September 25, 1994, and Greene was arrested that same day. ECF No. 21-6 at 10; ECCF No. 31-11 at 10. The murders took place two days earlier, on September 23, 1994. ECF No. 31-11 at 10. Due to the length of time between the murders and Greene's arrest and voluntary statement, any discovery of intoxication obtained from two days after the murder would be attenuated at best. As such, even if this discovery was relevant to show his trial counsel's alleged failure to present evidence that his drug intoxication constituted a defense to the crime of first-degree murder, I find that there is no good cause for these requests because, as was further discussed in ground 1(c), Greene is unable to demonstrate prejudice under *Strickland*.

Third, regarding the discovery of records related to the medication Greene received before and during his trial, any rules or protocols regarding the provision of mental health care and the administration of his medication, the results of any psychological testing that may have been performed on him, any notes or other documents related to any psychological testing or evaluation performed on Greene, and any psychological reports, Greene argues that this discovery would support his claim that he was improperly administered anti-psychotic medication. ECF No. 200 at 10–11. However, as was discussed in ground 10, the law only provides for relief from unwanted treatment, but here Greene requested that he be prescribed the medication. As such, I find that there is no good cause for this discovery.

Finally, I find that there is no good cause to depose David Roger or to serve subpoenas on the Clark County District Attorney and Las Vegas Metropolitan Police Department. These requests relate to Fisher; however, as was discussed in ground 3, Fisher's testimony was immaterial under *Brady* and *Napue*, so whatever supplemental impeachment discovery may be obtained through these subpoenas would not affect the outcome of this action.

The motion for discovery is denied.

## VI. Motion for Evidentiary Hearing

Greene moves for this court to hold an evidentiary hearing. ECF No. 202. Greene argues that he is entitled to an evidentiary hearing (1) to resolve any factual disputes regarding the ineffective assistance of his post-conviction counsel and/or trial counsel within grounds 1(a), 1(b), 1(c), 1(d), 1(e), 2(c), 10(b), 11(c), 11(d), and 11(e); and (2) to show that the State's suppression of evidence established good cause and that the suppressed evidence was prejudicial within ground 3. *Id.* Respondents opposed the motion, and Greene replied. ECF No. 212; ECF No. 219.

### A. Governing law

28 U.S.C. § 2254(e)(2) provides as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

> (A) the claim relies on—
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

In *Shinn v. Ramirez*, the Supreme Court of the United States reinforced that when reviewing a federal habeas petition, the federal court may not consider any facts beyond the factual record presented to the state post-conviction relief court, unless one of the exceptions of § 2254(e)(2) applies. 596 U.S. 366, 382 (2022). The *Ramirez* Court also held that, with respect to procedurally defaulted claims not adjudicated on their merits in state court, the court reviewing the federal habeas petition may not hold an evidentiary hearing or otherwise consider new evidence, either regarding the question of cause and prejudice relative to a procedural default or regarding the merits of the claim, unless the requirements of § 2254(e)(2) are met. *Id.* at 382–91. The Ninth Circuit has read *Ramirez* to preclude a federal habeas court's consideration of evidence presented only in a procedurally barred state post-conviction action. *McLaughlin v. Oliver*, 95 F.4th 1239 (9th Cir. 2024) (finding that the petitioner's failure to present the evidence to the state courts "in compliance with state procedural rules" counts as a "fail[ure] to develop the factual basis of a claim in State court proceedings" under § 2254(e)(2)).

**B. Discussion**

First, regarding Greene's request for an evidentiary hearing to resolve any factual disputes regarding the ineffective assistance of his post-conviction counsel and/or trial counsel, he argues that any failure to develop and present evidence in state court was not his fault given that neither of his state post-conviction proceedings afforded him a full and fair opportunity to develop the facts of his ineffective assistance of trial or postconviction counsel claims. ECF No. 202 at 10.

For purposes of determining whether a petitioner must first meet the prerequisites of § 2254(e)(2), the term "fail" means "the prisoner must be 'at fault' for the undeveloped record in state court." *Williams*, 529 U.S. at 432, 434 ("[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."); *see also Ramirez*, 596 U.S. at 382–83 (affirming the prerequisites in § 2254(e)(2) apply only "when a prisoner 'has failed to develop the factual basis of a claim'"). "Diligence for purposes of [§ 2254(e)(2)'s] opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437; *see also Baja v. Ducharme*, 187 F.3d 1075, 1079 (9th Cir. 1999) (denying evidentiary hearing because petitioner did not comply with state law that required petitioner to come forward with affidavits or other evidence to the extent his claim relied on evidence outside the record).

Even if the state court *generally* thwarted Greene's ability to have full and fair evidentiary hearings during his first and second state post-conviction proceedings, which I need not decide, grounds 1(a), 1(b), 1(c), 1(d), 1(e), 2(c), 10(b), 11(c), 11(d), and 11(e) have all been found to be procedurally defaulted.[12] As such, as to these specific grounds at issue—rather than the evidentiary hearings as a whole—I find that the failure to develop the factual basis of these grounds is due to the negligence of Greene and/or his state post-conviction counsel. Accordingly, the requirements of § 2254(e)(2) are triggered and Greene fails to demonstrate that he has met these requirements.

[12] This court previously found that ground 1(a) "was not exhausted on the appeal in Greene's first state habeas action and was ruled procedurally barred in his second state habeas action," ground 1(b) "was not exhausted in Greene's first state habeas action," ground 1(c) "cannot be considered exhausted in Greene's first state habeas action," ground 1(d) "cannot be considered exhausted in Greene's first state habeas action," ground 1(e) was "not asserted on the appeal in Greene's first state habeas action, and, to the extent presented on the appeal in Greene's second state habeas action, they were ruled procedurally barred," ground 2(c) was not exhausted in "the appeal in his first state habeas action, and, to the extent Greene made any such claim on the appeal in his second state habeas action, the claim was ruled procedurally barred," ground 10(b) was not exhausted, ground 11(c) was unexhausted, ground 11(d) was unexhausted, and ground 11(e) was unexhausted. ECF No. 179 at 20–25, 32, 34–36.

Second, regarding Greene's request for an evidentiary hearing regarding ground 3, I have already determined that Greene is not entitled to relief on ground 3 because Fisher's testimony was immaterial in light of Barker's testimony. As such, further factual development to impeach Fisher would not affect my reasons for denying relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record . . . otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

The motion for an evidentiary hearing is denied.

## VII. Conclusion

IT IS THEREFORE ORDERED that the second amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 **[ECF No. 119] is granted as to grounds 1(a), 1(b), and 1(d) and denied as to the remaining grounds**. Greene's death sentence is vacated. Within 120 days[13] of the later of (1) the conclusion of any proceedings seeking appellate or certiorari review of this court's judgment, if affirmed, or (2) the expiration for seeking such appeal or review, Greene must be given a new penalty hearing.

IT IS FURTHER ORDERED that the motions for leave to conduct discovery and for an evidentiary hearing **[ECF Nos. 200, 202] are denied.**

IT IS FURTHER ORDERED that, to the extent it is necessary, a certificate of appealability is denied.

IT IS FURTHER ORDERED that the Clerk of Court (1) enter judgment, (2) provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court for Clark County, Nevada in connection with that court's case number C124806, and (3) close this case.

Dated: October 28, 2026

Cristina D. Silva
United States District Judge

[13] Reasonable requests for modification of this time may be made by either party.